Randy Crane, United States District Judge
I. Factual and Procedural Background
Now before the Court is the Motion for Summary Judgment filed by Defendant Rogelio Valdez, Chief Justice of the Texas Thirteenth Court of Appeals, in his individual and official capacities. (Dkt. No. 91). Plaintiff Bruce M. Anderson filed this lawsuit in October 2014 pursuant to 42 U.S.C. § 1983, alleging that Chief Justice Valdez violated Plaintiff's right to free speech under the First Amendment to the U.S. Constitution by retaliating against Plaintiff for reporting the potential misuse of public funds by Valdez. (Dkt. No. 1).[1] In January 2015, Defendant moved to dismiss Plaintiff's suit pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and Plaintiff responded by moving for leave to amend his complaint to add clarifying factual allegations. (Dkt. Nos. 16, 18). The Court granted the opposed motion for leave, thereby mooting the motion to dismiss, in April 2015. (Dkt. No. 29).
In May 2015, Defendant renewed his request for dismissal under Rule 12(b)(6), claiming that he was entitled to qualified immunity from Plaintiff's First Amendment claim against him in his individual capacity, and that Plaintiff lacked any factual or legal basis for his requests for declaratory and injunctive relief against Defendant in his official capacity. (Dkt. No. 35). In June 2015, the Court granted the motion to dismiss with respect to Plaintiff's request for declaratory relief, but denied Plaintiff's appeal to qualified immunity at the Rule 12(b)(6) stage and permitted Plaintiff to pursue his request for injunctive relief in the form of reinstatement. (Dkt. No. 42). Defendant appealed the Court's denial of qualified immunity to the Fifth Circuit Court of Appeals, and the Fifth Circuit affirmed. Anderson v. Valdez , 845 F.3d 580 (5th Cir. 2016), rh'g en banc denied (2017). Upon Defendant's request, opposed by Plaintiff, the Court stayed all proceedings during the pendency of the appeal, from July 2015 to January 2017. (Dkt. No. 52). In July 2017, the Court granted Plaintiff's second, opposed motion for leave to amend his complaint to add factual allegations relevant to a new, anticipated defense theory. (Dkt. No. 89). Through the instant Motion also filed in July 2017, after the close of discovery, Defendant now requests summary judgment on Plaintiff's First Amendment retaliation claim and request for reinstatement. (Dkt. No. 91; see Dkt. No. 69). Upon consideration of the Motion and *639 the parties' responsive briefing (Dkt. Nos. 94, 96), in light of the relevant law, the Court finds that the Motion must be denied for the following reasons.
II. Standard of Review
A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the lawsuit under the governing law, and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the record, if any, which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ; FED. R. CIV. P. 56(a), (c). Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial. Celotex , 477 U.S. at 324, 106 S.Ct. 2548 ; FED. R. CIV. P. 56(c). In conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc. , 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ; Anderson , 477 U.S. at 255, 106 S.Ct. 2505 ; Dean v. City of Shreveport , 438 F.3d 448, 454 (5th Cir. 2006). However, the nonmovant cannot satisfy its burden with "conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence." Chaney v. Dreyfus Serv. Corp. , 595 F.3d 219, 229 (5th Cir. 2010) ; see also Brown v. City of Houston , 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").
III. Overview of Summary Judgment Evidence[2]
A. Plaintiff's Work History with the Thirteenth Court of Appeals and Justice Rose Vela
The Thirteenth Court of Appeals (referred to herein as the "Thirteenth Court" or "Court") for the State of Texas is comprised of six elected Justices and divided between two courthouses, one in Corpus Christi and one in Edinburg. (Dkt. No. 91, VELA DEP. at p. 13; GSANGER DEP. at pp. 18, 31, 33; PERKES DEP. at pp. 14-15; DEFENDANT DEP. at p. 60).[3] Plaintiff testified that his employment as an attorney with the Thirteenth Court spanned over 20 years, during which time Plaintiff worked for four different Justices in Corpus Christi. After leaving his employment with the Hidalgo County District Attorney's ("DA's") Office in 1988, Plaintiff first worked as a briefing attorney for Chief Justice Paul W. Nye for five years. (Dkt. No. 91, PLAINTIFF DEP. at pp. 7-8, 146). When Nye retired, Plaintiff became a research attorney working on more complex cases for the next Chief Justice, Robert J. Seerden, until 1996.
*640 Id. at pp. 8-9. Plaintiff then received a promotion to the position of staff attorney for Justice J. Bonner Dorsey and held that position until Dorsey retired at the end of 2002. Id. at p. 9. After working as a writs attorney for the Nueces County DA's Office from early 2003 until the end of 2006, Plaintiff returned to the Thirteenth Court as a briefing attorney for newly-elected Justice Rose Vela. Id. at pp. 10, 12.
Justice Vela testified that she first met Plaintiff when she worked as a briefing attorney for Chief Justice Seerden from 1990 to 1992. (Dkt. No. 91, VELA DEP. at p. 66). During that time, Vela interacted with Plaintiff on a daily basis to conduct research and draft opinions for the Court. Id. at p. 68. When she became a Justice herself, Vela hired Plaintiff as her briefing attorney and he served in this position for the entirety of Vela's six-year term, from January 1, 2007 through December 31, 2012. Id. at pp. 12, 70-71. Vela explained that although the briefing attorney position was considered junior to the staff attorney position within each Justice's chambers,[4] she "had two very qualified attorneys, so [she] considered them to be equal." Id. at p. 70. Vela assigned her criminal cases to Plaintiff given his DA's Office experience, while the civil cases were assigned to the staff attorney who was board-certified in civil appellate law. Id. at pp. 72, 124-25. Although Vela opted for this general division of labor, she testified that both attorneys were able to and did work on both types of cases. Id.
Plaintiff testified that he is legally blind, and that he lost all reading vision in 1996, at which point he began using a print magnifier at work. (Dkt. No. 91, PLAINTIFF DEP. at pp. 15-16). Justice Vela suggested that because of his impairment, Plaintiff "was just a workaholic"; she described him as "an excellent attorney" and "by far, in my opinion, one of the hardest working attorneys that I had ever worked with in any...part of my career." (Dkt. No. 91, VELA DEP. at p. 123).
B. Justices Vela and Perkes Investigate Use of Chapter 22 Fund
Justice Vela testified that in early 2011, the Nueces County Republican Party approached her and newly-elected Justice Gregory T. Perkes about the party's interest in a bill filed in the Texas legislature to split the Thirteenth Court into two appellate courts, one in Corpus Christi and one in Edinburg. Id. at p. 17. At the time, Justices Vela and Perkes were the only Justices on the Thirteenth Court who had been elected as Republicans. (Dkt. No. 91, VELA DEP. at p. 133; PERKES DEP. at pp. 106-07). The remaining four Justices had been elected as Democrats. (Dkt. No. 91, VELA DEP. at p. 133). Vela and Perkes, along with Justice Nelda Rodriguez, were based in Corpus Christi, and Defendant and Justices Gina Benavides and Dori Contreras were based in Edinburg, although the Justices heard oral argument in both locations. (Dkt. No. 91, VELA DEP. at pp. 14, 132; Dkt. No. 91 at pp. 580, 584).
Justice Vela testified that in researching the bill to split the Thirteenth Court, she and Perkes learned of "a fiscal note attached to the bill, which meant that in order for the bill to succeed...it had to show that the effect of [the split] would be budget neutral." (Dkt. No. 91, VELA DEP. at pp. 17-18). The Justices then decided to "figure out how [the split could] be budget neutral by looking into the finances of the court[.]" Id. at p. 18.
In speaking with the Nueces County Judge, Nueces County Auditor, and the *641 Thirteenth Court's Chief Clerk at the time, Cathey Wilborn,[5] Justices Vela and Perkes became aware of a fund prescribed by Chapter 22 of the Texas Government Code ("Chapter 22 fund"), consisting of filing fees paid by litigants to the counties covered by the Thirteenth Court. (Dkt. No. 91, VELA DEP. at pp. 16, 20-21; PERKES DEP. at p. 35).[6] The Justices also learned that "there were leftover funds every year and those funds would go directly to the chief justice's office." (Dkt. No. 91, VELA DEP. at p. 16; PERKES DEP. at p. 35).[7]
At some point, a Texas Public Information Act request (referred to herein as "open records request") pertaining to the Chapter 22 fund was made by Joel Yowell, an individual involved in the local Republican party who had previously served as Justice Vela's campaign treasurer. (Dkt. No. 91, VELA DEP. at p. 23; see Dkt. No. 94, Exh. 13).[8] In a letter dated May 10, 2011, Defendant in his capacity as Chief Justice responded to Yowell that upon consultation with the Court's accountant, Thomas Mendez, the Thirteenth Court had decided to charge for the production of certain of the requested records, at the approximate total cost of $1,500.00. (Dkt. No. 94, Exh. 13). By letter dated June 1, 2011, Vela and Perkes wrote to Defendant about the open records request for documents related to the Chapter 22 fund, and stated that they had learned that this public fund had never been audited. (Dkt. No. 91 at p. 536). The Justices communicated their beliefs that "an audit of this fund (from its inception) to the present date [should] be performed by either the state or county auditor at the earliest possible date," and that such an audit was "the only true way to maintain the integrity of the accounting procedures and continued receipt of the fund, as well as to pass public scrutiny." Id.
At some point after the open records request, and possibly on two occasions, all of the Justices met to discuss the request and the Chapter 22 fund. (Dkt. No. 91, VELA DEP. at pp. 61-63; PERKES DEP. at p. 121-22; BENAVIDES DEP. at p. 52; DEFENDANT DEP. at p. 119). Defendant testified that when the Justices met, Vela inquired about the Chapter 22 fund, Defendant "proceeded to explain...what it [was] because Perkes was brand-new," and Vela *642 and Perkes told Defendant that they wanted an audit of the fund. (Dkt. No. 91, DEFENDANT DEP. at pp. 112-13). Defendant opposed the audit as costly and without reason, explaining:
Now, if you tell me there's some reason, if one of my employees is doing something wrong or, you know, you find out something's odd, let's do an audit. I will be the first one to be in line. But just to have an audit just to have an audit, you know, it doesn't make any sense.
Id. at pp. 113-14. Defendant also characterized the audit request as the unnecessary airing of "dirty laundry," explaining that the airing and resolution of any problem should first occur internally, rather than "out in public where people are listening to us." Id. at p. 120. According to Defendant, neither Vela nor Perkes ever expressed to him any belief that he had mismanaged the funds in the Chapter 22 account. Id. Defendant knew that Vela's former campaign treasurer had made the open records request, and had heard rumors that Vela was planning to run for office against him, but did not know whether the motivations for the audit were political. Id. at pp. 110-12, 117. To him, the audit request "was coming out of left field." Id. at p. 119.
Justice Perkes testified that when the Justices met, Perkes supported the request for records related to the Chapter 22 fund because the Justices had a fiduciary responsibility to the Thirteenth Court, and "it deeply concerned [him] that there was a fund that was unaudited, a public fund." (Dkt. No. 91, PERKES DEP. at pp. 122-23). He recalled Defendant referring to the Chapter 22 fund as a "slush fund." Id. at p. 133. Justice Benavides testified to her belief that an audit was an "unnecessary expenditure of money from the Court," given that the Office of Court Administration ("OCA") already reviews the Thirteenth Court's financial records, and also since the Court "[wasn't] having any problems that would require an audit." (Dkt. No. 91, BENAVIDES DEP. at pp. 51-53). She recalled that the other Justices "were all pretty much on the same page except for, of course, Justice Vela and Justice Perkes." Id. at p. 53. Perkes testified that Benavides also expressed her disagreement with the audit request in a separate, brief exchange with him after oral argument, and that in his opinion she was "sticking up for the chief." (Dkt. No. 91, PERKES DEP. at p. 138).
On or around July 5, 2011, Justices Vela and Perkes sent a letter to the OCA, the entity that "oversee[s]...the courts of appeal across the state of Texas," taking issue with a July 1, 2011 letter sent to the OCA by Defendant on behalf of the Thirteenth Court. (Dkt. No. 91, PERKES DEP. at pp. 141-42; Dkt. No. 91 at pp. 534-35). According to Vela and Perkes's letter, Defendant had written to the OCA that "[g]iven these lean financial times and the State budgetary cuts impacting the Court, the Court en banc determined that waiving the charges [for the open records request] was not in the public interest because the records sought do not primarily benefit the general public." (Dkt. No. 91 at p. 534). Vela and Perkes disagreed "that documents reflecting the Court's use of public, taxpayer funds does not 'primarily benefit the general public,' " and also with Defendant's representation that this determination was made "en banc" by all six of the Thirteenth Court Justices. Id. Vela and Perkes further expressed their concern that the Chapter 22 monies managed by Defendant were "possibly being used outside of their permissible scope," noting that the only monthly bank statement produced through the open records request showed check card charges to local restaurants. Id. at p. 535. The Justices sought "guidance as to the permissible use of these funds, so as to fully ensure compliance with the law," and also noted that no *643 action had been taken on their previous correspondence requesting an audit. Id.[9]
By letter dated September 22, 2011, the OCA responded that under the operative statutory provisions, "the only limitation on the Court's authority to use [the Chapter 22] funds is that they be used for official court business." Id. at pp. 532-33. The letter also recommended that "the appropriate entity to conduct...an audit would be the state auditor, not the county auditor," under the authority of Texas Government Code § 321.017. Id. at p. 533.[10] In or around November 1, 2011, Justices Vela and Perkes wrote to the State Auditor's Office to request an audit "as soon as possible," noting that "[u]ntil this week, [they] were not provided access to information regarding expenditures from [the Chapter 22 fund account managed by Defendant] and had no knowledge of how these funds were being utilized." (Dkt. No. 94, Exh. 15). Referencing bank statements and documentation provided in response to the open records request, and apparently attached to the letter,[11] the Justices opined that "the fund has been used for hotels, restaurants, travel, employee bonuses, birthday cakes, flowers and other various uses which we do not believe are within the permissible scope of the fund's use or are within the spirit of the intended use of taxpayer monies." Id. Vela testified that Yowell provided her with the bank statements and documentation, that she reviewed them pursuant to her responsibility as a steward of public funds, and that when the records revealed "questionable use of taxpayer money," she believed it her duty as a Thirteenth Court Justice "to do something." (Dkt. No. 91, VELA DEP. at pp. 24-25, 40-41). Perkes recalled Vela showing records to him, and that he saw charges for "meals for staff to go out for birthday parties" and "trips that seemed like they were not for judicial purposes." (Dkt. No. 91, PERKES DEP. at p. 134). However, he did not "carefully walk through the documents"; he wanted the fund audited but "did not want to get deep in the minutiae of the political that [he] saw going on." Id.
In a letter dated November 17, 2011 and addressed to Justices Vela and Perkes, with copies sent to the other Justices, the State Auditor's Office responded that "[d]ue to limited resources and our audit work schedule, the SAO will not be able to initiate an audit as requested at this time." (Dkt. No. 94, Exh. 16). Perkes testified to his belief that no audit ever occurred. (Dkt. No. 91, PERKES DEP. at p. 132).
C. Justice Vela Compares Chapter 22 Fund Records with Defendant's Campaign Finance Records, and Asks Plaintiff for His Opinion
Justice Vela testified that she did not involve Plaintiff in the audit request, and that she did not recall speaking to him about the Chapter 22 fund in 2011. (Dkt. No. 91, VELA DEP. at p. 134). However, sometime in 2012, while meeting with Plaintiff in her office during the course of the workday, she spoke to him about records she had obtained which indicated that Defendant had made "same day, same payee, exact same amount" charges to the "court account" and his campaign account, raising the concern of "duplicate reimbursements." Id. at pp. 76-81, 84, 134. Vela *644 asked Plaintiff for "his opinion, what did he think," and did not recall what Plaintiff told her. Id. at pp. 77, 82. Vela testified that she did not consider it Plaintiff's job duty to assist her in researching whether Defendant had violated the law, and that she did not ask Plaintiff to do any legal research on the issue. Id. at pp. 134-35. As she lacked "underlying data" for the records in her possession, Vela did not reach any conclusion about whether the records revealed any illegal activity or violations of the Texas Code of Judicial Conduct, and did not tell Plaintiff to report Defendant to anyone. Id. at pp. 82, 84, 86.
Plaintiff also provided testimony about Justice Vela's conversation with him, recalling that in early 2012, Vela called Plaintiff into her office during the workday and told him about the Chapter 22 fund records obtained through the open records request. (Dkt. No. 91, PLAINTIFF DEP. at pp. 21-23). Vela also told him that she had compared those records with Defendant's 2012 campaign finance records and had discovered that Defendant had taken "double reimbursements" from the two funds. Id. at pp. 24-26. Vela then asked Plaintiff for his opinion, in light of his past experience as a prosecutor, as to whether Defendant had committed any crime. Id. at p. 27. At the time, Plaintiff recalled hearing a radio story about a Texas state representative who "was caught taking double reimbursements, which constituted a crime." Id. at p. 31. Out of personal interest, Plaintiff had determined through an Internet search that the crime was "abuse of official capacity," and had looked up the crime in the Texas Penal Code. Id. On the basis of this recollection and the facts provided to him by Vela, Plaintiff offered his opinion that Defendant "may very well have committed the crime of abuse of official capacity." Id. at pp. 27-28, 33. Plaintiff testified that Vela did not ask him to report Defendant to the authorities. Id. at p. 39.
D. Plaintiff Sends Letters to Texas Supreme Court Chief Justice and State Commission on Judicial Conduct in October 2012
When Plaintiff began his employment with Justice Vela in 2007, he signed an "Oath of Briefing Attorney," sworn to and subscribed by Vela, which included the statement, "I recognize that I am subject to the provisions of the Code of Judicial Conduct and will observe the standards of fidelity and diligence prescribed." (Dkt. No. 91 at p. 497). Relevant to this case, the Texas Code of Judicial Conduct ("the Code") provides that "[a] judge shall comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."Id. at p. 503. The Code also contains a section outlining Texas judges' "Disciplinary Responsibilities," among them that:
[a] judge who receives information clearly establishing that another judge has committed a violation of this Code shall take appropriate action. A judge having knowledge that another judge has committed a violation of this Code that raises a substantial question as to the other judge's fitness for office shall inform the State Commission on Judicial Conduct or take other appropriate action.
Id. at p. 506.
After his conversation with Justice Vela, Plaintiff was disturbed by the possibility that the sitting Chief Justice of the Thirteenth Court had violated Texas law. (Dkt. No. 91, PLAINTIFF DEP. at p. 43). He saw it as "a matter of tremendous public importance," explaining that "[i]f a chief justice is taking double reimbursements and violating the Penal Code, that's extremely important and it needs to be stopped, it needs to be investigated and, if necessary, prosecuted." Id. at pp. 43-44. Plaintiff felt that Vela had an obligation to report Defendant *645 to the authorities and assumed that she would, but when he asked her in or around May or June 2012 whether she planned to do so, Vela responded that she did not because "it would look too political." Id. at pp. 44, 136, 157-58.
Plaintiff did not share Justice Vela's concern, and felt compelled to report Defendant. Id. at pp. 44, 157. He reasoned that "if it leaked out" that he made a report, and "if they tried to fire [him]," he needed to accumulate enough vacation pay to compensate him through the end of Vela's term in December 2012. Id. at pp. 135-37. After accumulating about two months of vacation pay, Plaintiff wrote to Wallace B. Jefferson, Chief Justice of the Texas Supreme Court, by letter dated October 10, 2012 and marked "confidential." (Dkt. No. 91, PLAINTIFF DEP. at pp. 44, 135-37; Dkt. No. 91 at pp. 556-57). Plaintiff explained what he knew of the Chapter 22 fund and the open records request, including the possibility that some documents responsive to the request had been destroyed. (Dkt. No. 91 at pp. 556-57).[12] He also recounted his conversation with Vela regarding Defendant's receipt of double reimbursements from the Chapter 22 fund and Defendant's campaign fund, and suggested that Defendant may have committed the crime of abuse of official capacity under Texas Penal Code § 39.02. Id. at p. 557. Plaintiff stated, "I am reporting this information to you because I do not know who else to report it to." Id. at p. 556.
On October 23, 2012, the Supreme Court's General Counsel responded by directing Plaintiff to the State Commission on Judicial Conduct ("SCJC"). Id. at p. 558. Plaintiff then wrote to the SCJC in another "confidential" letter dated October 30, 2012, nearly identical in substance to his previous letter to Chief Justice Jefferson. Id. at pp. 559-60. On November 13, 2012, the SCJC responded that it had "received [Plaintiff's] complaints against two (2) Texas judges," that the complaints would receive a thorough review and investigation, and that the proceedings were confidential. Id. at p. 562.
E. Plaintiff Applies to Work in Volunteer Capacity
In December 2012, as Justice Vela's term on the Thirteenth Court was nearing its end, Plaintiff asked Justice Perkes if he could stay on as a volunteer for the early part of 2013. (Dkt. No. 91, PLAINTIFF DEP. at p. 137; PERKES DEP. at p. 22; Dkt. No. 94, Exh. 11). Perkes testified that "[a] lot of your staff attorneys in the court stay one or two, maybe three years," so he surmised that Plaintiff "was hoping a position would open up that he could eventually take." (Dkt. No. 91, PERKES DEP. at p. 23). On December 17, 2012, Perkes sent an email to Defendant informing him of Plaintiff's request and Perkes's desire "to facilitate [Plaintiff] in that role for that time period," using "the identical procedure that we use for unpaid, summer interns." (Dkt. No. 94, Exh. 11). Perkes asked for Defendant's assistance and Defendant responded that he would "check into this and review the policy considerations." Id.
Defendant testified that he consulted the Thirteenth Court's Chief Clerk, Dorian Ramirez, in order to determine "what were the pros and cons and if that had ever happened and what do we need to do." (Dkt. No. 91, DEFENDANT DEP. at pp. 21, 105-06; see RAMIREZ DEP. at p. 5).[13] Ramirez *646 ultimately recommended that the request be denied because Plaintiff would not be covered by workers' compensation insurance, and also because the Court lacked equipment for him. Id. at pp. 106-08. Perkes also spoke with Justice Benavides about Plaintiff's request, "[not] so much about Plaintiff" himself, but "more about...procedure in the court"-that is, whether "we want to have attorney interns working in the court[.]" (Dkt. No. 91, PERKES DEP. at pp. 176-77; see also Dkt. No. 94, Exh. 11). Benavides testified that she gave Perkes her opinion that the request should be denied because "[w]e've never had...lawyers that are unpaid interns that aren't particularly working for any chambers, and we didn't have a policy in place that would allow that to occur." (Dkt. No. 91, BENAVIDES DEP. at p. 43).
Justice Perkes testified to his understanding that Defendant spoke to all of the Justices, who "basically said no" because "[t]hey didn't want to create a new policy of having people come and volunteer on the court like that." (Dkt. No. 91, PERKES DEP. at pp. 22, 25-27). Therefore, Perkes "told [Plaintiff] no." Id. at p. 22. Perkes did not recall Defendant, Benavides, or anyone else making any complaints about Plaintiff personally or about his work product, and neither Defendant nor Benavides testified to any other reason for denying Plaintiff's request to work in a volunteer capacity. (Dkt. No. 91, PERKES DEP. at pp. 168-69, 179-83; DEFENDANT DEP. at p. 108; BENAVIDES DEP. at p. 44). Perkes testified to his opinion that Plaintiff was an "excellent attorney," that he "did a good job" on the opinions he wrote for the Court, that he "was always pleasant and polite," and that he "basically kept to himself, did his job." Id. at pp. 165-68.
Plaintiff testified that on January 2, 2013, he began volunteering at the Nueces County DA's Office, located in the same building as the Thirteenth Court, and that he was still a volunteer there as of his March 2017 deposition. (Dkt. No. 91, PLAINTIFF DEP. at p. 13; see PERKES DEP. at p. 199).
F. In 2013, Former Justice Vela Provides Information to SCJC and Learns of Plaintiff's Complaint
Justice Vela testified that in February 2013, she received a telephone call from SCJC investigator Royce LeMoine, who informed her that he was investigating Defendant's use of funds and wanted all of the information Vela had relating to this investigation. (Dkt. No. 91, VELA DEP. at pp. 44-45). Vela perceived LeMoine's questioning as "accusatory," "almost like...he was investigating [her]." Id. at p. 47. LeMoine did not tell Vela that a complaint had been filed with the SCJC, or who had filed it. Id. at p. 45. That same month, Vela responded by letter and enclosed numerous documents, including the records she had indicating Defendant's potential receipt of double reimbursements, correspondence relating to Vela and Perkes's audit request, and a complete copy of the Chapter 22 fund bank account records for fiscal years 2008, 2009, and 2010. (Dkt. No. 91, VELA DEP. at pp. 43-45; Dkt. No. 94, Exh. 21). Vela testified that she possibly copied the Texas Attorney General's ("AG") Office on her letter to the SCJC. (Dkt. No. 91, VELA DEP. at p. 94).
At some point in 2013, after Justice Vela sent the information to LeMoine, Plaintiff told Vela that he had filed a complaint with the SCJC. (Dkt. No. 91, VELA DEP. at pp. 46-47; PLAINTIFF DEP. at p. 71). Plaintiff testified that Vela called to tell him that someone had reported Defendant to the SCJC, at which point Plaintiff responded, "[W]ell, your Honor, it was me." (Dkt. No. 91, PLAINTIFF DEP. at p. 71).
*647 G. Travis County DA's Office Initiates Investigation and Plaintiff Provides Information to DA's Office in April 2013 and April 2014
Travis County DA's Office records indicate that on March 7, 2013, the Texas AG's Office forwarded to the DA's Office a letter from Justice Vela reporting that Defendant "is improperly charged (sic) a taxpayer funded account while at the same time charging his campaign expense account, thus 'double dipping.' " (Dkt. No. 94, Exh. 22). On this basis, in April 2013 the DA's Office Special Prosecution/Public Integrity Unit opened a case to investigate the allegations. See id. Vela recalled that sometime after March 2013, she received a few calls from the Travis County DA's Office about the investigation. (Dkt. No. 91, VELA DEP. at pp. 95-100). She did not remember the substance of the conversations, nor whether she provided any documents to the DA's Office. Id.
After becoming aware of a possible investigation by the Travis County DA's Office,[14] Plaintiff wrote to the DA's Office by letter dated April 30, 2013 and marked "confidential," disclosing that he had reported Defendant to the SCJC in October 2012, and offering information concerning additional double reimbursements that he had since learned of from former Chief Clerk Wilborn,[15] as well as additional observations he had made while employed by the Thirteenth Court concerning the possible destruction of records responsive to the open records request. (Dkt. No. 91 at pp. 550-52). Plaintiff opined that any destruction of records could not have occurred without the knowledge and cooperation of the Thirteenth Court's Chief Staff Attorney, Cecile Gsanger, the Court's current Chief Clerk, Ramirez, and Mendez, who Plaintiff identified as "the Court's administrative assistant." Id. at p. 551. Almost one year later, on April 14, 2014, Plaintiff again wrote to the Travis County DA's Office to offer additional information given him by Wilborn concerning Defendant's receipt of double reimbursements. Id. at pp. 547-49.
H. Plaintiff Applies for Position as Justice Perkes's Senior Staff Attorney, Receives and Accepts Job Offer, and Is "Un-Hired"
1. Job Posting and Overview of Applicable Thirteenth Court Hiring Procedures and Administrative Rules
In the spring of 2014, Justice Perkes's senior staff attorney resigned and Perkes began looking for a replacement. (Dkt. No. 91, PERKES DEP. at pp. 30-31, 189-90; HOLLOWAY DEP. at pp. 34-35; LOCKWOOD DEP. at pp. 13-14). At the time, Perkes was the only Justice on the Thirteenth Court who had been elected as a Republican, and he remained based in Corpus Christi along with Justice Rodriguez. (Dkt. No. 91, LOCKWOOD DEP. at p. 37; PERKES DEP. at pp. 16-17; Dkt. No. 91 at p. 580). Justice Nora Longoria, who had replaced Justice Vela, officed primarily in Edinburg along with Defendant and Justices Benavides and Contreras. (Dkt. No. 91, PERKES DEP. at p. 17; DEFENDANT DEP. at p. 61; BENAVIDES DEP. at pp. 69-70; Dkt. No. 91 at pp. 582, 584).
*648 At the time, the responsibility for drafting and posting the Thirteenth Court's job openings fell to Chief Clerk Ramirez and/or to Chief Staff Attorney Gsanger. (Dkt. No. 91, GSANGER DEP. at pp. 122-23; RAMIREZ DEP. at p. 11).[16] The job posting for Perkes's senior attorney, which listed a start date of May or June 2014 and required the submission of applications to Ramirez, set forth "minimum qualifications" including "[t]hree to five years of prior legal experience" and "preferred qualifications" including "prior work for an appellate court or other appellate experience." (Dkt. No. 91 at pp. 501-02). The Thirteenth Court's Hiring Procedures in effect at the time instructed, in relevant part, that "[i]n order to be eligible for a particular position, an applicant must meet all of the minimum qualifications as noted on the job posting." Id. at p. 528. The Procedures further stated that "[a]n applicant does not have to have the preferred qualifications to be eligible for the position," although generally, "those applicants meeting the greater number of job qualifications should be more competitive." Id. The Procedures also provided:
Hiring decisions shall be made by the appropriate 'hiring official," as follows: Senior attorneys, briefing attorneys, and legal assistants shall be hired by the Justice to whom they are assigned. Deputy clerks shall be hired by the Clerk of the Court, upon the approval of a majority of the Court, en banc. All other employees shall be hired by a majority of the Court, en banc.
Id.
Among the Thirteenth Court's Administrative Rules approved by the Justices in 2011, Rule 21 provided that "[e]ach justice shall have one legal assistant, one senior staff attorney and one junior staff attorney or briefing attorney," and that "[e]ach justice shall be solely responsible for all employment and management decisions regarding his or her staff." (Dkt. No. 91 at p. 524, Rule 21-Supervision of Staff; see also Dkt. No. 94, Exh. 29). Rule 23, the final rule, allowed for amendment or temporary suspension of the Administrative Rules "[b]y majority vote of the Court en banc[.]" (Dkt. No. 91 at p. 525, Rule 23-Suspension and Amendment of the Rules).
2. Plaintiff Applies for the Job
Justice Perkes testified that although April was "not a good time to be looking for candidates" for the senior attorney position, and the pool of applicants was small, he had inherited a backlog of work from his predecessor Justice and believed it urgent to fill the position. (Dkt. No. 91, PERKES DEP. at pp. 30-31, 169-70, 240-41). Plaintiff was among those who applied for the job. (Dkt. No. 91, PLAINTIFF DEP. at pp. 153-54). Perkes's entire chambers-the outgoing senior attorney, junior staff attorney Daniel Lockwood, and legal assistant Caylie Holloway-participated in reviewing the applications submitted, and agreed that Plaintiff was the top candidate. (Dkt. No. 91, PERKES DEP. at pp. 39-40, 191-93; HOLLOWAY DEP. at pp. 35-36, 39; LOCKWOOD DEP. at pp. 14-15). Perkes testified that the other applicants "just weren't even close"-that "without a doubt," there was "a mile between number one and number two." (Dkt. No. 91, PERKES DEP. at pp. 40, 192-93, 196). Perkes had observed Plaintiff working with Justice Vela and thought he was someone with whom Perkes could work closely. Id. at p. 196. Perkes also testified that despite Plaintiff's visual impairment, "[h]e got product out pretty fast," and that perhaps because of that *649 impairment, Plaintiff "had one of those minds" that was "[e]nhanced." Id. at p. 198. Perkes explained:
You walk in and talk to [Plaintiff] about a case or a particular issue, and he would pop up, 'It's so-and-so case.' Bing, bing, bing. And there are not many attorneys this day and age that can do that. [He] had a good knack for being able to converse that way.
Id.
Justice Perkes's junior attorney Lockwood, whose employment overlapped with Plaintiff's employment from August through December 2012, testified that he never heard any criticisms of Plaintiff or his work product during that time. (Dkt. No. 91, LOCKWOOD DEP. at p. 11). Lockwood described Plaintiff as "very astute," with "a very good mind for criminal law especially," and testified that he had periodically asked for and received assistance from Plaintiff when Lockwood was "spinning [his] wheels on a particular assignment." Id. at pp. 10-11. Lockwood testified that based on what he knew, Plaintiff was qualified for the position of Perkes's senior attorney. Id. at pp. 14-15.
3. Justice Benavides Expresses Concerns about Plaintiff's Potential Hiring
Justice Benavides testified that even before the job posting, she knew that Justice Perkes was looking for a senior attorney. (Dkt. No. 91, BENAVIDES DEP. at p. 70). When she learned that Perkes intended to interview Plaintiff for the position, she called Perkes "because [she] didn't want him to hire [Plaintiff]." Id. at p. 71. According to Perkes, Defendant first informed him that Benavides had issues with Plaintiff, at which point Perkes had a meeting with Benavides to discuss those concerns. (Dkt. No. 91, PERKES DEP. at pp. 42, 45). Perkes explained that "if somebody's saying they have a problem with [an attorney] who...would have been my senior staff attorney..., I needed to know about it and if it could be resolved, so we sat down and talked." Id. at p. 44. Perkes described the Thirteenth Court at the time as "very political" and "hostile," and testified that he "didn't want to create additional hostilities." Id. at pp. 43-44.
Justice Benavides testified that she and Justice Vela had started at the Thirteenth Court at the same time, and that she became familiar with Plaintiff's work through the circulation process used to review and edit the Court's opinions. (Dkt. No. 91, BENAVIDES DEP. at pp. 15-26). Generally, the process begins with the random assignment of a case to a panel of three Justices, one of whom is assigned as the "writing author." Id. at p. 19. In the stage of the process known as "first circulation," that Justice's initial draft of the opinion circulates among all of the panel Justices' attorneys, who edit the opinion before sending it to "second circulation," i.e. , review by Chief Staff Attorney Gsanger. Id. The opinion then goes to "third circulation" among the three Justices on the panel. Id. If Benavides had an issue with an opinion, either because her attorneys "red-flagged" it at first circulation or based on her own review at third circulation, she would talk to the writing Justice and/or the attorney who wrote the opinion for that Justice. Id. at pp. 21-22.
By the end of Justice Vela's term, Justice Benavides had developed the following opinions regarding Plaintiff and his work product: (1) Plaintiff had a tendency to write opinions that "did not fully flush out all the facts and issues in a case"; (2) Plaintiff was "not a team player" in the circulation process, in that he "did not participate in the editing process in a manner that was efficient for the Court"; (3) he had an arrogant attitude toward Benavides *650 and was not open to criticism. Id. at pp. 27-30.
Based on her observations, Justice Benavides implemented a special policy within her chambers for when Plaintiff was the attorney writing an opinion. Id. at pp. 37-40. At third circulation, Benavides would require her staff to provide her with the first circulation edits so that she could evaluate whether her attorneys' recommendations were being followed. Id. at p. 38. Benavides testified that her attorneys' edits were not generally included, in which case she would advise Justice Vela's chambers that the edits needed to be included before she would "sign off" on the opinion. Id. at p. 39. "Sometimes they would do them, sometimes they wouldn't," and if her attorneys' edits were not included, Benavides would then determine whether to write a separate concurrence or a dissent, or to just "let it go" and sign off on the opinion. Id. Benavides testified that this policy caused delays in the circulation process. Id. at p. 40.
Justice Benavides testified that she raised all of these issues when she spoke with Perkes, and that she also expressed her concern that Plaintiff "only handled criminal matters, and Justice Perkes'[s] docket was behind and [she] thought that would only make [his] docket further behind." Id. at p. 72. At the end of the conversation, Benavides thought she had convinced Perkes not to hire Plaintiff. Id. at p. 74. She suggested re-posting the position, and also offered to reach out to other lawyers to find new candidates. Id. Perkes, however, left the conversation with the understanding that he could address and resolve Benavides's concerns with Plaintiff, and that in such case Benavides did not oppose Plaintiff's hiring. (Dkt. No. 91, PERKES DEP. at pp. 43-44).
Justice Benavides testified that she also spoke with Defendant and Justices Contreras and Longoria about Plaintiff's potential hiring, but did not detail for them the issues she had with Plaintiff; she merely told them that she had concerns and had raised those concerns with Justice Perkes. (Dkt. No. 91, BENAVIDES DEP. at pp. 75-78).
4. Justice Perkes Interviews and Hires Plaintiff
Plaintiff testified that he had an informal interview with Justice Perkes during the first week of April, and that "the first words out of [Perkes's] mouth were, 'I heard that you reported the Chief to the State Commission on Judicial Conduct, how is that going?' " (Dkt. No. 91, PLAINTIFF DEP. at pp. 74, 120). Plaintiff confirmed that he had reported Defendant to the SCJC and relayed what Justice Vela had told him about Defendant's potential receipt of double reimbursements. Id. at pp. 74-75.
Plaintiff recalled that his formal interview occurred on May 2, 2014, whereas Justice Perkes remembered interviewing Plaintiff only once, on that date. (Dkt. No. 91, PLAINTIFF DEP. at p. 129; PERKES DEP. at pp. 32-33, 40-42). Perkes testified that during the interview process, he never asked Plaintiff whether he had filed a complaint against Defendant. (Dkt. No. 91, PERKES DEP. at p. 33). Perkes recalled that he spent time talking to Plaintiff about Justice Benavides's concerns, and that he "really wanted to impress upon [Plaintiff] that I'm hiring him with those things in mind, and we're going to have to really work on those things." Id. At the conclusion of the interview, Perkes offered Plaintiff the job, and Plaintiff accepted it. (Dkt. No. 91, PLAINTIFF DEP. at p. 129; PERKES DEP. at p. 201). According to Plaintiff, Perkes instructed him to tell Chief Clerk Ramirez that he had been hired. (Dkt. No. 91, PLAINTIFF DEP. at p. 129).
*651 5. Plaintiff Is "Un-Hired"
a. After Defendant Learns of Hiring, He Asks Chief Staff Attorney to Look into Plaintiff's Opinion History
On the morning of May 2, 2014, Ramirez sent an email to Justice Perkes, copying Defendant and Mendez, stating that Plaintiff had just come to her office asking for the amount of his gross salary. (Dkt. No. 91 at p. 499). Ramirez asked, "Am I to assume that [Plaintiff] has been hired for the position?" Id. Ramirez forwarded this email to Chief Staff Attorney Gsanger, who responded, "Crap!" Id.
Several minutes later, Justice Perkes responded by email, "Yes, I am hiring [Plaintiff] as my Senior Staff Attorney." Id. at p. 500. Perkes copied his staff and Gsanger on his response, and Ramirez forwarded the response to Defendant. Id. Defendant testified that he then called Ramirez and Gsanger, who both expressed concerns about whether Plaintiff was qualified for the position. (Dkt. No. 91, DEFENDANT DEP. at pp. 123-24, 134-36; see also GSANGER DEP. at pp. 155-56; RAMIREZ DEP. at pp. 42-43). Ramirez and Gsanger each testified at length about their concerns, some of which resembled the concerns raised by Justice Benavides. See (Dkt. No. 91, RAMIREZ DEP. at pp. 43-63; GSANGER DEP. at pp. 63-114). According to Gsanger, she provided "the same detail" to Defendant. (Dkt. No. 91, GSANGER DEP. at p. 156). Ramirez remembered telling Defendant that Plaintiff "was unprofessional, he was difficult to work with, and he was inappropriate at times." (Dkt. No. 91, RAMIREZ DEP. at pp. 43-44).
According to Defendant, it was "for [him] to decide what was going to be the salary," so he "had to decide whether or not [Plaintiff] was qualified...and competent for the position to make that final decision." (Dkt. No. 91, DEFENDANT DEP. at p. 139). Defendant testified that a Justice's senior attorney "need[s] to understand and know how to do criminal cases and civil cases," and that in order to determine whether Plaintiff qualified for the job, Defendant asked Gsanger to look into Plaintiff's opinion history. Id. at pp. 139-40. Gsanger recalled Defendant asking her to verify whether Plaintiff had written only criminal opinions, and also that they discussed Justice Perkes's docket and its needs. (Dkt. No. 91, GSANGER DEP. at pp. 156-58).
That same afternoon, Gsanger responded to Defendant's request via email marked "confidential," noting that she had only been able to retrieve data from fiscal year 2009 through the end of Justice Vela's term, and that according to this data, Plaintiff "did not write any civil cases during this period of time-all 132 cases were criminal." (Dkt. No. 91 at p. 516; see also pp. 517-22). Gsanger's email also noted that Defendant "had asked about the other applicants for the position," and that she thought that Ramirez could forward the applications to Defendant if desired. Id. at p. 516.
b. Defendant Speaks with Justice Perkes
Defendant testified that he also called Justice Perkes and "explained to him [Plaintiff's]...lack of cooperation being a team player..., following up on the duties of edits," and also that Defendant "had done some research and [Plaintiff] only did criminal cases." (Dkt. No. 91, DEFENDANT DEP. at pp. 144-45). Defendant reminded Perkes of his repeated requests for help with the civil docket, leading Defendant to believe that Perkes "would be looking for...somebody who's strong on civil[.]" Id. at p. 146. Defendant admitted that Perkes still wanted to hire Plaintiff, believing that he could correct any issues with his managerial style. Id. Defendant therefore *652 suggested that they "take it en banc" and "see what the rest of the judges...think about it," and Perkes agreed. (Dkt. No. 91, DEFENDANT DEP. at p. 147; see also PERKES DEP. at p. 278).
c. Defendant Speaks with Other Justices
Defendant testified that at that point, he had already spoken with Justice Benavides and "[knew] what...her vote [was] going to be." (Dkt. No. 91, DEFENDANT DEP. at p. 148). He then spoke with each of the other three Justices, explaining to them that Justice Perkes wanted to hire Plaintiff, and that Defendant "personally [had] some problems with it" and believed that Plaintiff was not qualified for the position. Id. at pp. 148-49, 152. According to Defendant, all of the Justices told him, "Well, we have problem[s] with him too," and "our opinion is that it wouldn't be a good idea." Id. at p. 149.
Justice Rodriguez, who had served on the Thirteenth Court since 1995, and whose principal office was in Corpus Christi, stated in her sworn declaration that by the time Plaintiff left the Court at the end of 2012, she "had developed a general concern about the thoroughness of the analysis presented in his legal opinions," and that she "felt obliged to give [Plaintiff's opinions] extra attention because [she] no longer had confidence in their depth or accuracy." (Dkt. No. 94 at p. 580). Rodriguez also attested that on the basis of her observations, she believed that Plaintiff "did not fully participate in the circulation process," "often did not incorporate the edits of other staff attorneys," and "rarely offered his own edits." Id. She also felt that Plaintiff "was not a good team player," "always seemed to have a chip on his shoulder," and "often acted in an arrogant manner-as though he believed he knew more than the Justices on the Court." Id. Rodriguez remembered Defendant calling to ask her opinion about Plaintiff's hiring, and that she "told him [she] was absolutely against it and if there was any way to prevent him from coming back, [she] was all for it." Id.
Justice Longoria, whose term with the Thirteenth Court began in 2013, and whose principal office was in Edinburg, attested in her declaration that she participated in a discussion with Defendant and Justices Benavides and Contreras in which Benavides "voiced serious misgivings about whether [Plaintiff] would be a good hire, particularly given that Justice Perkes was already behind on his docket." Id. at p. 582. Longoria also recalled Benavides expressing "specific concerns regarding [Plaintiff's] refusal to work on civil cases and his failure to both make edits on other lawyers' opinions and...to incorporate other staff attorneys' edits in draft opinions." Id. Since she had never worked with Plaintiff, Longoria "deferred to the majority, which [she] understood to be against the hiring decision." Id.
Justice Contreras, who had served on the Thirteenth Court since 2002, and who at the time was based in Edinburg, stated in her declaration that she learned of Plaintiff's potential hiring from Justice Benavides, who reported that she had expressed concerns about the hiring to Justice Perkes. Id. at p. 584. Those concerns were that Plaintiff "had not participated fully in the circulation process, that he would not take edits when other staff attorneys commented on his work, and that he was not a team player." Id. Contreras "shared Justice Benavides's concerns because [she] had witnessed the same issues with [Plaintiff's] work performance," and therefore "when asked by [Defendant]," she told him that she thought Plaintiff should not be hired. Id.
Each of the Justices stated that Defendant did not attempt to sway her opinion regarding Plaintiff's hiring. Id. at pp. 581, 582, 584.
*653 d. Defendant Notifies Justice Perkes That He and Other Justices Do Not Approve of Plaintiff's Hiring, and Perkes's Office Informs Plaintiff That He No Longer Has a Job
On the morning of May 6, 2014, Justice Perkes notified Defendant by email that it was his current senior attorney's last day of work, and that Perkes would "need to move asap re [Plaintiff]," especially since he had already offered Plaintiff the job. (Dkt. No. 91 at p. 565). Perkes stated his belief that Plaintiff's work ethic and Perkes's style of management would "move these cases along" and meet the concerns discussed with Benavides, and subsequently with Defendant. Id. Perkes also informed Defendant that "none of the other candidates have any court experience and would require training and downtime," and therefore in the event that Perkes was "not allowed to bring [Plaintiff] on board," he would "need some assistance with [his] docket." Id.
That same hour, Defendant emailed Ramirez and Gsanger, "Can you please call me to address my decision on [Plaintiff]." (Dkt. No. 94, Exh. 32). In his ensuing conversation with Ramirez, Defendant asked her to draft a response to Justice Perkes based on that conversation, which she did. (Dkt. No. 91, DEFENDANT DEP. at pp. 192-93; RAMIREZ DEP. at 100-03; Dkt. No. 94, Exh. 33). Later that afternoon, Defendant emailed the response to Perkes: "After due consideration and after consulting with all of the other justices, we do not approve of your request and recommendation to hire [Plaintiff]." (Dkt. No. 91 at p. 565). The response also offered Defendant's and the other Justices' assistance in reviewing applications and interviewing potential candidates for the position. Id.
Within minutes, Justice Perkes responded by email, "I would request assistance then with respect to cases to which I have been assigned," suggesting "two cases per Justice." Id. at p. 566. He also suggested that since "[t]he applicant pool of experienced attorneys is lacking at this time," "[t]he best that we can do is re-post," and stated his intention to forward to Defendant the applications received thus far. Id. Immediately thereafter, Perkes forwarded his initial email and Defendant's response to Holloway, asking her to "call the OCA and find out who I would need to speak with regarding staff attorney hires," and to do it "ASAP." (Dkt. No. 94, Exh. 35). That same hour, Defendant emailed Perkes that the posting was still open, that Defendant would be happy to assist with the hiring process, and that the Justices would discuss the status of Perkes's docket at the next conference. (Dkt. No. 91 at p. 567).
Justice Perkes acknowledged that under the Court's Administrative Rules, he did not need the other Justices' approval to hire anyone, but testified that "our rules tended to be fluid in those situations, and if there are five judges against me, that's a quick vote." (Dkt. No. 91, PERKES DEP. at pp. 47-48). He opined that "[t]he effect of what the court did was to suspend their rules" under Rule 23-a position also taken by Gsanger, who testified to her understanding that a majority of the Court en banc decided to temporarily suspend or amend Rule 21, which allows a Justice to hire his own staff, with respect to the hiring of Plaintiff. (Dkt. No. 91, PERKES DEP. at pp. 114-15; GSANGER DEP. at pp. 44-47).[17] Even so, Perkes testified that he *654 "didn't believe in the total veracity" of Defendant's statement that all of the other Justices had disapproved of Plaintiff's hiring. (Dkt. No. 91, PERKES DEP. at p. 72). Defendant himself disagreed that Rule 23 had been invoked in this situation, characterizing his discussions with the other Justices as "trying to learn the facts before I make a final decision...on the salary [and on] whether...I need to object to it or not." (Dkt. No. 91, DEFENDANT DEP. at pp. 143-44).
Justice Perkes testified that he "was steadfast in favor" of Plaintiff, and that in his view, his decision to hire Plaintiff was "countermanded" and "rescinded." (Dkt. No. 91, PERKES DEP. at pp. 82, 233, 290). At that point, "it put [Perkes] in substantial difficulty keeping the docket up while [he] had to go through the whole [hiring] process again." Id. at p. 233. He testified that "the only thing [he] could think of [was to] write a letter to the chief justice of the Supreme Court or send a letter to the OCA, ...neither of which really had jurisdiction over the local court." Id. at p. 53. He remembered deliberating with Holloway on whether to contact the OCA, and in the end concluded, "This is already a done issue. Move on." Id. at p. 48.
On May 8, 2014, Holloway called Plaintiff to tell him that he no longer had a position with Justice Perkes. (Dkt. No. 91, PLAINTIFF DEP. at pp. 103-104; HOLLOWAY DEP. at p. 65). Holloway felt "horrible" about making the call and "didn't want to do it," explaining that she "felt bad for [Plaintiff]" and believed that "[t]here was no logical reason for him not to be hired." (Dkt. No. 91, HOLLOWAY DEP. at p. 66).
I. Testimony Concerning Defendant's Intervention in Other Justices' Hiring Decisions
Defendant recalled two other occasions when he intervened in another Justice's hiring decisions. (Dkt. No. 91, DEFENDANT DEP. at pp. 221-22). The first time, newly-elected Justice Longoria "didn't have a good pool" of staff attorney applicants and wanted to hire two "rookie" attorneys-one "right out of law school" and one who had only been an attorney for a few months-for the senior and junior attorney positions. Id. at pp. 169-70. Defendant told Longoria "that it was not a good idea, that she was going to have problems," explaining in his testimony that a senior attorney without the minimum three-to-five years' legal experience was "not going to be able to...do the job." Id. at pp. 171-73. Defendant therefore suggested that Longoria find a senior attorney among the other Justices' junior attorneys with requisite experience, which she did. Id. at p. 171.
The second time, when Justice Longoria's senior attorney left and she had selected a new hire, Defendant asked Gsanger to check the applicant's references and Gsanger "came back with some negative reviews"-namely, that the applicant was "not a team player," "disrespectful," and "not very dependable." (Dkt. No. 91, DEFENDANT DEP. at pp. 218-21). Defendant then relayed this information to Justice Longoria, who decided to hire someone else. Id. at p. 221.
J. After Plaintiff Is "Un-Hired," Justice Perkes Has Discussions with Former Justice Vela, His Chambers, and Plaintiff
In an exchange of text messages on May 9, 2014, Justices Perkes and Vela discussed *655 the intervention in Plaintiff's hiring. (Dkt. No. 91, VELA DEP. at p. 112; PERKES DEP. at pp. 65-66; Dkt. No. 91 at pp. 568-79). Vela recalled that she reached out to Perkes after Plaintiff called to tell her that "he got unhired," and that he "was confused and didn't understand what happened." (Dkt. No. 91, VELA DEP. at pp. 110-11). The following text exchange ensued:
Justice Vela : "Hey greg, what happened with Bruce-he called and told me he wasn't going to work with you after all? Did something happen that made you change your mind? Don't worry I won't tell him[.]"
Justice Perkes : "Nope, Roy went to war over Bruce and all of the rest of the justices...[k]owtowed to Roy's wishes. Nothing I could do other than start lengthy process with OCA, with unpredictable results...."
Justice Vela : "Why is Roy against him? Didn't know he even knew he existed[.]"
Justice Perkes : "You got me. However, we had a big argument over this. The only thing that I can think of is that he got wind of Bruce and the investigation. Considering the timing of Roy's intervention, Dorian [Ramirez] may have also played a part. It wasn't pretty. She's Roy's eyes and ears up here [in the Corpus Christi office],[18] as you know."
Justice Vela : "Dorian? What's with her? Does she not like Bruce? So what reason did roy give?"
Justice Perkes : "Not part of the team, did [not][19] make edits to other justices opinions, solely knows how to work on criminal matters, not deep enough research of the issues (merely copied state's briefs)."
Justice Vela : "Wow..I remember they [made] such a big deal about how each chambers could hire whoever they want... It has to be more than that..Dorian or Cecile [Gsanger] might suspect Bruce of starting the investigation[.]"
Justice Perkes : "My gut feeling, but don't know. At end, there are no rules except what majority wants them to be at that particular moment. But you know that[.]"
Justice Vela : "Poor Bruce."
Justice Perkes : "Please let him know that it was not my decision. I had already hired and done all that I was required to do."
Justice Vela : "Ok, do [you] want me to tell him why-I'm sure he will ask[.]"
Justice Perkes : "What do you think??? I don't have a problem [with] him knowing."
...
Justice Vela : "Also, they may not like the fact that we (Bruce and me) got them reversed so much! Especially roy and Gina [Benavides] on the criminal cases. And Gina roy and dori [Contreras] on civil[.]"
Justice Perkes : "I agree!"
(Dkt. No. 91 at pp. 568-79). Vela believed that the text exchange constituted the only discussion she had with Perkes about the withdrawal of Plaintiff's job offer. (Dkt. No. 91, VELA DEP. at pp. 117-18). With regard to the reasons relayed to her for why Defendant opposed Plaintiff's hiring, Vela testified that no one had expressed these concerns to her when she was on the Court, and in fact offered testimony discounting the concerns about Plaintiff and *656 his work product that were noted in the text exchange and by other deponents in this case. Id. at pp. 112-13, 123-32. Perkes also testified that he had "never heard of anything negative at all with regard to [the] personality of [Plaintiff]," and that he had not previously heard of any criticisms of Plaintiff's work product. (Dkt. No. 91, PERKES DEP. at pp. 170-72). Perkes testified, "[T]o the contrary, I thought he was an excellent attorney. He was timely, and the product appeared to be good." Id. at p. 172.
Whereas Justice Vela interpreted Justice Perkes's reference to the "investigation" of which Defendant may have "gotten wind" as "the one that was being done by the [SCJC]," Perkes testified that he was referring to the "original investigation, when [Perkes] came on the court, regarding the [Chapter 22] funds[.]" (Dkt. No. 91, VELA DEP. at p. 137; PERKES DEP. at pp. 74-76, 95, 249). Perkes explained that he told Vela that the other Justices had "kowtowed" to Defendant's wishes based on his observations of the Thirteenth Court and his "gut feelings" at the time. (Dkt. No. 91, PERKES DEP. at p. 68). He described the Court as a "very politically divided" environment in which Defendant "would say things, and the other justices would basically go that direction." Id. Based on Perkes's previous conversation with Justice Benavides, in which they discussed the same reasons given by Defendant for not hiring Plaintiff, Perkes believed that he had resolved those concerns with Benavides, and therefore "the only person that came to mind at that point, it had to be [Defendant]." Id. at pp. 69, 79-80. Perkes explained that his "gut instinct" that Ramirez also played a part stemmed from his observation that Ramirez "works right under [Defendant], and basically her job is contingent upon [Defendant]," and that if Perkes "said anything to [Ramirez], [Defendant] would know it within minutes." Id. at pp. 76-77.
Justice Perkes testified that after the text exchange with Justice Vela, junior attorney Lockwood approached Perkes at the office and first alerted him that Plaintiff had filed a complaint against Defendant. (Dkt. No. 91, PERKES DEP. at pp. 33-34, 56-57, 94-95). According to Perkes, he had suspected Plaintiff's involvement in Vela's original investigation into the Chapter 22 fund, but found it "shocking" that Plaintiff had filed a formal complaint. Id. After learning about the complaint from Lockwood, Perkes spoke with Holloway, who provided him with a little more information. Id. at pp. 57-58, 63-64. According to Perkes, he did not know where the complaint was sent-just that Plaintiff sent it. Id. at pp. 247-48. He testified that Lockwood and Holloway may have thought that he already knew about the complaint, when in reality "[his] thought was going way back to the original investigation with regard to the funds," and that he and his staff "obviously did not have a communication there." Id. at pp. 248-49.
Justice Perkes surmised that Lockwood and Holloway learned of the complaint from speaking to other Court employees or staff attorneys, among them Plaintiff, explaining that in the Corpus Christi office, "[a]ll the judges [are on] one side, and all the staff are together on another side," and "they're going to talk to each other." Id. at pp. 57-58, 254-56.[20] Lockwood recalled that on May 6, 2014, the day Defendant *657 informed Perkes that the other Justices did not approve of Plaintiff's hiring, Perkes "was frustrated and a bit flustered" and told Lockwood in chambers, "[B]etween you and me, [Plaintiff] might be privy to certain information involving [Defendant] that [Defendant] knows about, and...he's taking...retaliation against [Plaintiff]." (Dkt. No. 91, LOCKWOOD DEP. at pp. 23, 26-27). Lockwood could "not recollect whether [Perkes] said that the process had been formalized through a complaint or not," and thought that Justice Rodriguez's staff attorney may have been the first to inform Lockwood that Plaintiff had formally complained with "the ethics or the supreme court[.]" Id. at pp. 27-28, 33-34. Lockwood believed that Rodriguez's staff attorney knew about this formal complaint at the time Plaintiff's job offer was withdrawn. Id. at p. 34. He testified that he did not know whether anyone else at the Court, including Holloway, knew of the complaint. Id. at pp. 34-37.
Holloway testified that while still on the Thirteenth Court, Justice Vela had given her a set of documents containing copies of checks, and had asked Holloway to tell Vela what she thought of them. (Dkt. No. 91, HOLLOWAY DEP. at pp. 23-28, 33). Holloway reviewed the documents at home and formed the opinion "that there was something not right about funds being used from [Defendant's] campaign and also funds coming from a local fund that were to the same place, the same amount." Id. at pp. 28-29. Holloway recalled giving the documents back to Vela, but did not remember whether she shared her opinion about them with Vela. Id. at p. 30. Holloway did remember having a conversation with Plaintiff when he was still working for the Court, at which time Plaintiff told her that he had reported Defendant. Id. at pp. 31-32. Holloway knew only that Plaintiff "wrote a grievance and sent it," but did not know where the grievance was sent. Id. at p. 45. Holloway claimed that she did not talk to anyone else, including Justice Perkes, about the contents of the documents given her by Vela, because she "didn't want anything coming back on Judge Perkes, [and she] just knew that if [Plaintiff] had reported it, that hopefully somebody would do something." Id. at pp. 30-31. Holloway also claimed that she did not tell anyone about Plaintiff's "grievance," including Perkes, because she "didn't want Judge Perkes involved." Id. at pp. 47, 68. At some point, she "just got the idea that [Perkes] knew" about the grievance, but she did not think that he knew at the time he interviewed Plaintiff for the senior attorney position. Id. at pp. 50-51. Holloway testified that before she called Plaintiff to tell him that he no longer had a job, she wrote down talking points to follow when speaking to him because she "didn't want to deviate" and "give [her] reasons as to why"-that is, her opinion that "they didn't want to hire [Plaintiff] because of his grievance." Id. at pp. 13, 66-67.
Plaintiff testified that on May 12, 2014, a few days after the text exchange between Justices Perkes and Vela, Plaintiff called Perkes. (Dkt. No. 91, PLAINTIFF DEP. at p. 93). According to Plaintiff, Perkes told him that Defendant "took it upon himself to tell all the judges on the court not to allow me to work for Justice Perkes" because Plaintiff had filed a complaint against Defendant with the SCJC. Id. at pp. 58, 93, 104-05. Plaintiff testified that Perkes further informed him that Defendant "brought the issue up for a vote and it went 5 to 1," with Perkes voting for Plaintiff and the other five Justices voting against him. Id.
Justice Vela testified that she also spoke with Plaintiff after the text exchange, but by then Justice Perkes had called Plaintiff "and explained to him what happened"-that "he didn't get the job because the other judges had voted not to...employ *658 him." (Dkt. No. 91, VELA DEP. at p. 115). Vela did not give Plaintiff her opinion as to why, other than to state her belief that the situation was "unusual," since "when [she] was on the court every judge had...the right to hire whoever they wanted[.]" Id. at p. 116.
Justice Perkes did not offer any testimony concerning a phone call with Plaintiff; rather, he remembered that at some point after Plaintiff's offer of employment was withdrawn, Plaintiff came to Perkes's office to "try[ ] to figure out what went on," and that in their short conversation, Perkes told Plaintiff, "They said no. I don't know anything else [that] I can tell you." (Dkt. No. 91, PERKES DEP. at pp. 59, 97). Perkes denied telling Plaintiff that Defendant intervened in the hiring decision because Plaintiff had filed a complaint against Defendant, recalling, "I told [Plaintiff] I felt bad about him. I had a bad feeling in my gut, but that's about as far as it went."Id. at pp. 59-60, 96-97.
K. Additional Evidence Regarding Justices' and Thirteenth Court Employees' Knowledge of Plaintiff's Communications with SCJC and/or Travis County DA's Office
Plaintiff testified that before Defendant's intervention in his hiring, Plaintiff had spoken with one former and one current Thirteenth Court employee about his communications with the SCJC and/or the Travis County DA's Office.[21] Plaintiff recalled telling former Chief Clerk Wilborn in 2013 about his complaint to the SCJC, and his letters to the Travis County DA's Office setting forth information learned from Wilborn which provide some indication that he also spoke to her about the DA's Office investigation and his involvement in it. (Dkt. No. 91, PLAINTIFF DEP. at pp. 72-73, 99-100; see Dkt. No. 91 at pp. 547-52). Plaintiff further testified that in or around May or June 2013, he was in his office at the Nueces County DA's Office when he had a telephone conversation with the Thirteenth Court's Civil Clerk, Patty Fowler, who asked him, "[W]hat's going on with Chief Justice Valdez?" (Dkt. No. 91, PLAINTIFF DEP. at pp. 100-01; see HOLLOWAY DEP. at p. 69). Plaintiff asked Fowler to come to his office, where he told her that Defendant was under investigation by the Travis County DA's Office, which had statewide jurisdiction to investigate crimes involving public officials, and that it was Plaintiff who had reported Defendant to the SCJC after learning from Justice Vela that Defendant may be taking double reimbursements from the Chapter 22 fund and his campaign finance fund. (Dkt. No. 91, PLAINTIFF DEP. at pp. 101-02).
Defendant and Justice Benavides testified that they did not know whether Plaintiff had any involvement in Justices Vela and Perkes's request for an audit of the Chapter 22 fund, and all five of the Justices who opposed Plaintiff's hiring attested that they did not know about Plaintiff's complaints to the SCJC or any other law enforcement entity until after Plaintiff's job offer was withdrawn. (Dkt. No. 91, DEFENDANT DEP. at pp. 239-40, 174-75; BENAVIDES DEP. at pp. 53-54; Dkt. No. 91 at pp. 581, 583, 584-85). Defendant stated that he first became aware that Plaintiff had filed a formal complaint against him in October 2014, when he received a fax from Plaintiff's counsel providing pre-suit notice of Plaintiff's federal court complaint. (Dkt. No. 91, DEFENDANT DEP. at pp. 174-75; see Dkt. No. 91 at pp. 537-45). Justice Benavides testified that she first became aware of accusations of "double dipping" by Defendant, and that Plaintiff *659 had communicated these accusations in "some complaints" against Defendant, when Defendant informed all of the Justices of the lawsuit and Benavides then read Plaintiff's pleading. (Dkt. No. 91, BENAVIDES DEP. at pp. 54-58). Justices Rodriguez, Contreras, and Longoria also stated that they did know that Plaintiff had filed complaints against Defendant with the SCJC or any governmental entity until after the filing of this lawsuit. (Dkt. No. 91 at pp. 581, 583, 584-85). According to Benavides, upon learning of the lawsuit, the Justices discussed among themselves that "none of [them] knew" that Plaintiff had filed any complaint. (Dkt. No. 91, BENAVIDES DEP. at pp. 57-58).
Gsanger and Ramirez testified that they did not learn of any formal complaints filed by Plaintiff until October 2014, when Plaintiff's counsel sent Defendant a draft of the pleading in this lawsuit. (Dkt. No. 91, GSANGER DEP. at pp. 138-40; RAMIREZ DEP. at pp. 65-72). Gsanger did not recall when she first learned of the allegations underlying those complaints-that Defendant was potentially taking double reimbursements from the Chapter 22 fund and his campaign fund-whereas Ramirez testified that she learned of those allegations when she learned of the lawsuit. (Dkt. No. 91, GSANGER DEP. at p. 230; RAMIREZ DEP. at pp. 70-72). Both Gsanger and Ramirez remembered speaking to Defendant about the lawsuit, and also that he gave them an explanation for the allegations of "double dipping"-that the identical charges to each account reflected travel expenses for him and his wife. (Dkt. No. 91, GSANGER DEP. at pp. 141-42, 148-49, 233-34; RAMIREZ DEP. at pp. 76-78).
Celinda Coronado, who served as Defendant's legal assistant from 2008 through 2015, testified that at Defendant's instruction, she charged Defendant's and his wife's travel expenses to separate accounts. (Dkt. No. 91, CORONADO DEP. at pp. 5, 14-16). She also stated that she did not remember Defendant receiving a call at the office from the SCJC or the Travis County DA's Office, and that she learned of Plaintiff's complaints to these entities after the filing of this lawsuit. Id. at pp. 28, 51-52.
L. Justice Perkes Hires His Junior Staff Attorney for the Job
On May 8, 2014, the date Plaintiff's job offer was withdrawn, Defendant sent an email to Justice Perkes recommending that Gsanger "serve as [Defendant's] proxy" in the process of evaluating and recommending a replacement. (Dkt. No. 91, PERKES DEP. at pp. 269-70; DEFENDANT DEP. at pp. 195-96). Gsanger confirmed that she participated in the process, along with Perkes, Lockwood, and Holloway. (Dkt. No. 91, GSANGER DEP. at p. 200). Perkes ultimately hired a new junior attorney and, effective July 1, 2014, promoted Lockwood to the position of senior attorney even though he lacked the three-to-five years' legal experience required for that position. (Dkt. No. 91 at p. 495; PERKES DEP. at pp. 263-65; GSANGER DEP. at pp. 203-04, 206; DEFENDANT DEP. at p. 197; LOCKWOOD DEP. at p. 43). Perkes acknowledged that he "really wanted somebody that was out five, six, seven [years], you know, a longer term with a lot more experience," but that "nobody in the well...was even close," and therefore he based his hiring decision not on "the number of years" but on "appellate experience and writing experience." (Dkt. No. 91, PERKES DEP. at p. 263). According to Gsanger, "[t]he ideal would have been to find an attorney with lateral outside experience to fill [the senior attorney] position," but since "[t]hat applicant did not come forward, [Lockwood] was promoted." (Dkt. No. 91, GSANGER DEP. at p. 217). Gsanger testified to her belief that Defendant and the other Justices agreed to waive the minimum experience requirement, whereas *660 Defendant testified that he did not know whether Lockwood had the legal experience required for the senior attorney position. (Dkt. No. 91, GSANGER DEP. at pp. 206-07; DEFENDANT DEP. at p. 202). Defendant testified that any such lack of experience would not concern him since Lockwood's "work product has...already been reviewed by...the other attorneys" and "seems to be satisfactory." (Dkt. No. 91, DEFENDANT DEP. at p. 203). Ramirez, who learned of Lockwood's lack of required legal experience at her deposition, testified that the lack of experience concerned her "[b]ecause we have a [job posting] that says one thing and yet Justice Perkes had decided to promote [Lockwood] to senior attorney." (Dkt. No. 91, RAMIREZ DEP. at pp. 116-17). Ramirez was not aware of any other occasion when the Court hired an attorney who did not meet the minimum experience requirement. Id. at p. 126.
M. Status of SCJC and Travis County DA's Office Investigations
Justice Vela testified that sometime in 2013, after she had communicated with SCJC investigator LeMoine, she received a letter from the SCJC stating its determination that Vela herself had "done no wrongdoing." (Dkt. No. 91, VELA DEP. at p. 51). Several years later, by letter dated February 10, 2017, the SCJC informed Plaintiff that it "reviewed the facts and evidence obtained in the course of its investigation, which evidence included reviewing court records, interviewing individuals with knowledge of the matters addressed in the information [Plaintiff] provided, and performing legal research regarding the issues raised by [Plaintiff's] complaint," and that "[i]n its discretion, the [SCJC] determined that there was insufficient evidence that [Defendant] engaged in 'double dipping' or engaged in retaliatory conduct toward [Plaintiff]." (Dkt. No. 91 at pp. 563-64). Therefore, "[t]hose allegations were dismissed without prejudice." Id. at p. 563.[22]
With regard to the Travis County DA's Office investigation into Defendant's potential receipt of double reimbursements, Justice Vela remembered receiving a call from a DA's Office representative informing her that "they weren't going to pursue it," but did not remember why, nor did she recall receiving a closure letter. (Dkt. No. 91, VELA DEP. at pp. 104-05). The record contains no other competent evidence regarding whether Plaintiff's April 2013 or April 2014 letters to the Travis County DA's Office were addressed or resolved.[23] However, the record does contain evidence that Plaintiff reported Defendant's alleged retaliation against him through another letter to the DA's Office dated May 13, 2014, and that on June 27, 2014, the DA's Office responded that it lacked venue over the matter. (Dkt. No. 91 at pp. 546, 553-55). In his May 2014 letter, Plaintiff claimed that Defendant had "convinc[ed] the other Justices on the Court to vote against Justice Perkes'[s] attempt to hire [Plaintiff]" solely because Plaintiff had "satisfied [his] duty" under the Texas Code of Judicial Conduct to report Defendant's alleged criminal behavior to the SCJC. (Dkt. No. 91 at pp. 553-55). Plaintiff's letter stated, "I do not know how [Defendant] found out that I reported him to the [SCJC]. I did not tell him." Id. at p. 554.
IV. Analysis
A. Overview of Applicable Law and Grounds for Summary Judgment
Section 1983 provides a claim against any "person" who, "under color of *661 any statute, ordinance, regulation, custom, or usage, of any State," violates another's rights under the U.S. Constitution. 42 U.S.C. § 1983 ; e.g. , Whitley v. Hanna , 726 F.3d 631, 638 (5th Cir. 2013). A plaintiff may bring a § 1983 claim against a person in his individual or official capacity, or against a local government entity. Goodman v. Harris Cty. , 571 F.3d 388, 395 (5th Cir. 2009) ; Monell v. Dep't of Soc. Servs. , 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (municipalities and other local government units are "persons" subject to suit under § 1983 ). A § 1983 suit against a person in his official capacity is a suit against his office, and is no different from a suit against the entity itself. Will v. Mich. Dep't of State Police , 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (citing Kentucky v. Graham , 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ; Monell , 436 U.S. at 690 n.55, 98 S.Ct. 2018 ).
To prevail on a § 1983 claim, a plaintiff must demonstrate: (1) the violation of a right secured by the Constitution; and (2) that the deprivation of that right was committed by a person acting under color of state law. Whitley , 726 F.3d at 638 (quoting James v. Tex. Collin Cty. , 535 F.3d 365, 373 (5th Cir. 2008) ). In this case, Plaintiff alleges the violation of his right to free speech, as secured by the First Amendment to the U.S. Constitution, and that Defendant in his capacity as Chief Justice deprived Plaintiff of that right. The First Amendment, made applicable to the States through the Fourteenth Amendment, provides in relevant part that "Congress shall make no law...abridging the freedom of speech[.]" U.S. CONST. amend. I ; Meyer v. Grant , 486 U.S. 414, 420, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). It encompasses "not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." Keenan v. Tejeda , 290 F.3d 252, 258 (5th Cir. 2002) (citing Colson v. Grohman , 174 F.3d 498, 508 (5th Cir. 1999) ). Here, Plaintiff alleges that Defendant took adverse action against him because of Plaintiff's complaints against Defendant to Chief Justice Jefferson, the SCJC, and/or the Travis County DA's Office, by intervening in Justice Perkes's decision to hire Plaintiff.
"To establish a § 1983 claim for employment retaliation related to speech, a plaintiff-employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient promotion of public services; and (4) the speech precipitated the adverse employment action." Nixon v. City of Houston , 511 F.3d 494, 497 (5th Cir. 2007) (citations omitted) (internal quotations omitted). Defendant's Motion does not contest the first element-the record is uncontroverted that Plaintiff was "un-hired" for the job of Justice Perkes's senior staff attorney-and the Court notes that genuine issues of material fact exist as to whether Defendant's intervention in that hiring effectuated the adverse action.[24] Although the Motion itself contests the remaining elements, Defendant's reply concedes Plaintiff's argument that the Court need not balance the interests involved in the third element given Defendant's assertion that he lacked any knowledge of Plaintiff's alleged protected speech prior to the adverse action, and also since Defendant himself indicated that the speech would not serve as a significant impediment to Plaintiff's reemployment with the Thirteenth Court. See (Dkt. No. 91 at pp. 29-33; Dkt. No. 94 at pp. 24-28; Dkt. No. 96 at pp. 14-15). Therefore, Defendant only *662 seeks summary judgment on the second and fourth elements of Plaintiff's retaliation claim.
Relevant to the individual-capacity claim against him, Defendant's Motion also renews his appeal to the defense of qualified immunity, on the basis of the summary judgment record now before the Court. (Dkt. Nos. 91, 96). Finally, Defendant submits that the Court lacks subject-matter jurisdiction over Plaintiff's official-capacity claim and corresponding request for injunctive relief in the form of reinstatement to the job of which Defendant allegedly deprived him. Id.
B. Contested Elements of Plaintiff's First Amendment Retaliation Claim
1. Second Element
Plaintiff challenged the second element at the pleading stage, both in this Court and in his unsuccessful appeal, arguing that Plaintiff's alleged speech at the time-his letter to Chief Justice Jefferson and his complaint to the SCJC, both sent while he was still employed as Justice Vela's staff attorney-was made "pursuant to his official duties as a public employee, so his speech was unprotected" under Garcetti v. Ceballos , 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). Anderson , 845 F.3d at 592 ; see (Dkt. No. 42 at pp. 9-15). More specifically, Plaintiff suggested that his "ethical duties as a lawyer-including his duty to report malfeasance" under the Texas Rules of Disciplinary Conduct-"were incorporated into his official duties as a public employee." Anderson , 845 F.3d at 592 ; see (Dkt. No. 42 at pp. 11-12) (citing TEX. DISCIPLINARY R. OF PROF'L CONDUCT R. 8.03(b), reprinted in TEX. GOV'T CODE , tit. 2, subtit. G, app. A, art. 10, § 9 ("[A] lawyer having knowledge that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office shall inform the appropriate authority.").
The Fifth Circuit's analysis of Plaintiff's appeal to Garcetti serves as the framework for this Court's consideration of Plaintiff's renewed, albeit slightly altered, challenge to the second element at the summary judgment stage. As the Fifth Circuit observed, Garcetti's holding actually incorporates both the second and third elements of a First Amendment retaliation claim, in that the Supreme Court decided that when a public employee speaks pursuant to his official duties, the public employer's interest in "disciplining, viz. , controlling" its employee "automatically outweighs" the employee's interest in speaking on matters of public concern,[25] thereby rendering the employee's speech unprotected by the First Amendment. Anderson , 845 F.3d at 593. The Fifth Circuit more specifically described the employer's interest in controlling its employees' speech as an interest in "requiring speech by...employees that enables 'the efficient provision of public services' " as well as "prohibiting speech that does not, including that which 'contravene[s] [the public employer's] policies or impair[s] the proper performance of [its] functions.' " Id. at 593 (quoting Garcetti , 547 U.S. at 419, 126 S.Ct. 1951 ) (alterations in original). Although Defendant has recently abandoned his challenge to the third element, in part due to his concession that Plaintiff's speech would not serve as an impediment to reemployment *663 with the Thirteenth Court, disruption of the public employer's interest in furthering "the efficient provision of public services" is inherent in a finding that Plaintiff spoke as an employee for First Amendment purposes.
The Fifth Circuit found otherwise, however, on the basis of the allegations in Plaintiff's Second Amended Complaint. In holding that Plaintiff had sufficiently alleged that his letter to Chief Justice Jefferson and his SCJC complaint constituted speech made as a citizen and not as an employee, the Court found guidance in the following principles elucidated by Garcetti and precedent interpreting it: (1) that a public employee's speech is made pursuant to his official duties when that speech is made "in the course of performing his job"; (2) that "[w]hen a public employee speaks pursuant to employment responsibilities...there [will be] no relevant analogue to speech by citizens who are not [public] employees"; and (3) official duties are those "created by and owed to," and therefore lawfully controlled by, the employer. Anderson , 845 F.3d at 594 (quoting Garcetti , 547 U.S. at 424, 126 S.Ct. 1951 ), 595 (citing Williams , 480 F.3d at 694 ; Davis v. McKinney , 518 F.3d 304, 313 (5th Cir. 2008) ; Nixon , 511 F.3d at 498 ), 597-98 (citing Garcetti , 547 U.S. at 421-22, 426-26, 126 S.Ct. 1951 ). The Fifth Circuit found noteworthy Plaintiff's allegations that his supervisor, Justice Vela, "did not ask him, much less require him," to send the letter or complaint-he alleged that he did so on his own initiative-and that he asked that his speech be kept confidential, leading the Court to query, "[i]f [Plaintiff], as Vela's briefing attorney, had an official duty to send the letter or to file the complaint, then why [would he] have purposely concealed his doing so from her?" Id. at 598-99. The Court also reasoned that in contrast to the prosecutor's disposition memorandum in Garcetti -"made for the benefit of the employer," who "had directed the employee to create it [and] could also direct the employee to alter or discard it," and could discipline the employee if he failed to do so-Plaintiff's alleged speech had a citizen "analogue" and did not fall within his employer's lawful control. Id. at 597-99. That is, the speech was not an "[o]fficial communication" with "official consequences," "requiring anyone at the Thirteenth Court to ensure that it was 'accurate, demonstrate[d] sound judgment, and promote[d] the employer's mission.' " Id. at 597 (quoting Garcetti , 547 U.S. at 422-23, 126 S.Ct. 1951 ) (alteration in original). "Instead, it was 'the kind of activity engaged in by citizens'-including licensed lawyers-'who do not work for the government.' " Id. (quoting same). As the Fifth Circuit observed, "[a]ll lawyers, not just lawyers who are public employees, have a duty to report malfeasance," and "[i]f it is not lawful and appropriate for the employer to exercise control" over speech exposing malfeasance, by virtue of "safeguards in the form of...rules of conduct," "the employee is, quite simply, not speaking pursuant to his official duties." Id. at 597-98 (citing Garcetti , 547 U.S. at 425-26, 126 S.Ct. 1951 ).
The dissenting opinion took issue with the majority's borrowing and distinguishing from Garcetti , noting that since the prosecutor's memorandum reported "police misconduct, specifically, misrepresentations made in a warrant affidavit," under the majority's analysis the memo might just as easily have been characterized as "whistleblower" speech not subject to employer control. See Anderson , 845 F.3d at 604 (Jones, J., dissenting). However, whistleblower laws did not create the duty on the part of the plaintiff to write the memo recommending disposition of the case-his job duties did. See Williams , 480 F.3d at 693 (when plaintiff in Garcetti "articulated his opinion about a case in a memorandum to his supervisor, alleging that the police *664 acted inappropriately in gathering evidence, he did exactly what he was required to do" as a prosecutor and calendar deputy). Here, "rules of conduct" applicable to all attorneys created the duty to engage in the particular form of speech at issue before the Fifth Circuit-a letter and complaint disclosing the potential misuse of public funds by a sitting state-court justice-not Plaintiff's employer. To put it another way, the relevant "analogue" is one of role, not content, and to determine the role the speaker occupied, courts must consider the source of his obligation to speak. If this obligation is "created by and owed to" the employer, the employer may control that speech regardless of its content. If it is not, the employer may not lawfully control speech exposing governmental misconduct.
Plaintiff has since filed his Third Amended Complaint, alleging that his protected speech includes the letter and complaint considered by the Fifth Circuit, as well as two letters sent to the Travis County DA's Office when Plaintiff no longer worked for the Thirteenth Court. Through its Motion, rather than appeal to a duty created by the Texas Rules of Disciplinary Conduct and shared by all lawyers, Defendant now asserts that when Plaintiff used information obtained from Justice Vela pursuant to "a duty she held as a Justice"-that is, her review of records relating to the Chapter 22 fund-in order to fulfill another duty Plaintiff shared with Vela under the Texas Judicial Code, by virtue of his Oath of Briefing Attorney, Plaintiff's "reporting to the SCJC was triggered by his obligations as [an employee] and controlled by Vela, and his letters to the [DA's Office] were a continuation of that speech." (Dkt. No. 91 at pp. 26-29). The difficulty with the attempted distinction between the Texas Rules of Disciplinary Conduct and the Texas Judicial Code is that, relevant to this case, their provisions are substantively the same; whereas the former requires "[a] lawyer having knowledge that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office [to] inform the appropriate authority," the latter applies that rule to lawyers who happen to be judges (and through Plaintiff's Oath of Briefing Attorney, to lawyers who happen to work for judges). Compare TEX. DISCIPLINARY R. OF PROF'L CONDUCT R. 8.03(b); (Dkt. No. 91 at p. 506). In other words, the speech retains its citizen analogue, as well as the protection against employer control. Although Defendant submits that the Thirteenth Court "could have simply not subjected [Plaintiff] to the Judicial Code's reporting obligations," and therefore the decision to do so was "itself an action exercising control over employees' speech," as an attorney Plaintiff had the same obligation regardless of that decision. (Dkt. No. 96 at p. 10) (emphasis in original). Moreover, as Plaintiff points out, the Preamble to the Code states that "intrinsic" to all of its sections "are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to enhance and maintain confidence in our legal system." (Dkt. No. 94 at p. 24) (citing Dkt. No. 91 at p. 503). "In other words, the Code is intended to compel judges and judicial employees to act in the interest of the public and the legal system as a whole, not a particular employer." (Dkt. No. 94 at p. 24). Any duty Plaintiff had to report Defendant's alleged misuse of public funds was neither created by the Thirteenth Court, nor owed to the Thirteenth Court as an employer.
The Fifth Circuit's determination that Plaintiff's October 2012 letter and complaint "were not created pursuant to his official duties" also hinged on Plaintiff's allegations, now supported by the summary judgment record, that Justice Vela did not ask Plaintiff to report Defendant to *665 anyone, that Plaintiff did so on his own initiative, and that Plaintiff marked his letter and complaint "confidential."[26] Vela may have supplied Plaintiff with information raising the specter of malfeasance, but evidence exists that Plaintiff's choice to forward his opinion to Chief Justice Jefferson and the SCJC was his own, and not otherwise contemplated by his actual job duties as the briefing attorney responsible for the criminal cases assigned to Vela. See Garcetti , 547 U.S. at 424-25, 126 S.Ct. 1951 (whether speech is made pursuant to employment duties is a "practical" inquiry, not determined by formal job descriptions but by duties that an employee "actually is expected to perform").
Finally, with regard to the speech made subsequent to Plaintiff's employment-his letters to the Travis County DA's Office-Defendant argues only that these letters were "a continuation" of employee speech. (Dkt. No. 91 at p. 29) (citing Nixon v. City of Houston , 511 F.3d 494, 498-99 (5th Cir. 2007) (police officer's presumably off-duty statements to radio talk shows and television news program constituted a "continuation" of his accident-scene statements made the previous day in his role as an employee, and were "seemingly controlled by Garcetti ")). As the Court has rejected the premise of this contention, it finds Defendant's argument unavailing.[27]
The Court concludes that the record does not establish as a matter of law that Plaintiff spoke as an employee for purposes of the second element of his First Amendment claim, and therefore the balancing of interests involved in the third element does not "automatically" tip in Defendant's favor. If it did, this would equate to a finding that the Thirteenth Court has an automatic, superior interest in disciplining attorneys for complying with their professional ethical obligations-a finding that Garcetti does not sanction.
2. Fourth Element
a. Overview of Applicable Law
The Court considers the fourth element of Plaintiff's retaliation claim-whether his protected speech precipitated the adverse employment action at issue-under a burden-shifting framework. See , e.g. , Haverda v. Hays Cty. , 723 F.3d 586, 591-92 (5th Cir. 2013). First, the plaintiff must show that the speech was a "substantial" factor, or in other words, a "motivating" factor in the defendant's adverse action. Mt. Healthy City. Sch. Dist. Bd. of Educ. v. Doyle , 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ; id. at 591. Inherent in this initial burden to show causation is the burden to demonstrate the defendant's knowledge of the protected speech at the time of the adverse employment action. See Chaney v. New Orleans Pub. Facility Mgmt., Inc. , 179 F.3d 164, 168 (5th Cir. 1999) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment *666 action, the employer plainly could not have retaliated against the employee based on that conduct.") (Title VII case). If the plaintiff meets his burden, the defendant "may still avoid liability by showing, by a preponderance of the evidence, that [he] would have taken the same adverse employment action even in the absence of the protected speech." Haverda , 723 F.3d at 591-92 (citing Mt. Healthy , 429 U.S. at 287, 97 S.Ct. 568 ). The plaintiff may then refute that showing by presenting evidence that the defendant's "ostensible explanation for the [adverse action] is merely pretextual." Id. at 592 (quoting Coughlin v. Lee , 946 F.2d 1152, 1157 (5th Cir. 1991) ).
b. Plaintiff's Burden: Protected Speech Was Substantial or Motivating Factor in Adverse Action
i. Plaintiff May Not Meet Burden with His Own Assertion That Speech Was "Known," But May Do So with Circumstantial Evidence
Defendant's challenge to the causation element, and in particular the knowledge requirement subsumed in that element, has been raised and rejected by this Court and by the Fifth Circuit at the pleading stage. See (Dkt. No. 29 at pp. 6-7; Dkt. No. 42 at pp. 8-9; Dkt. No. 89 at pp. 6-7); Anderson , 845 F.3d at 590-92. However, the factual allegations given credence at that stage have now given way to a voluminous summary judgment record, and the single cited authority on which the Fifth Circuit relied no longer provides guidance-that is, Plaintiff's own assertion that his speech was "known" by Defendant does not raise a genuine issue of material fact on whether Defendant had awareness of Plaintiff's protected speech, which in turn motivated Defendant's intervention in Justice Perkes's decision to hire Plaintiff. See Anderson , 845 F.3d at 591 n.22, 592 n.28 (quoting Cox v. Kaelin , 577 Fed.Appx. 306, 312 (5th Cir. 2014) (unpublished) ("[T]he employee] pleads that his [speech] was 'known,' and thus it is plausible that his [speech] motivated his eventual termination.") (alteration in original)).
Defendant's Motion now takes the position that Plaintiff has pointed to no "actual evidence" that Defendant knew of Plaintiff's letters to Chief Justice Jefferson, the SCJC, or the Travis County DA's Office, pointing to Defendant's sworn testimony that he did not, and to the lack of evidence directly refuting this testimony. (Dkt. No. 91 at p. 34). However, as the Court has previously observed, "direct evidence in proving illegitimate intent is not required to avoid summary judgment in unconstitutional retaliation claims; circumstantial evidence will suffice." Fowler v. Smith , 68 F.3d 124, 127 (5th Cir. 1995). In fact, "direct evidence of improper motive is usually difficult, if not impossible, to obtain and requiring direct evidence would effectively insulate from suit public officials who deny an improper motive in cases such as this." Id. Thus, a circumstantial "trail of breadcrumbs" may suffice to support a jury's conclusion that a defendant harbored a retaliatory motive based on the plaintiff's protected speech. Jordan v. Ector Cty. , 516 F.3d 290, 301 (5th Cir. 2008).
ii. Circumstantial Evidence Cases Cited by Plaintiff
Plaintiff's response contends that the present case is analogous to others in which circumstantial evidence created a fact issue sufficient to meet the plaintiff's initial burden at the summary judgment stage. (Dkt. No. 94 at pp. 28-35).[28] In *667 Bregon , an unpublished Fifth Circuit case, the summary judgment record demonstrated that the plaintiff was fired only a week after he filed his protected complaint, and the plaintiff "offered evidence that people at work were likely aware of his complaint." Bregon , 128 Fed.Appx. at 361. Observing that "the combination of temporal proximity and possibility of knowledge of the complaint is sufficient to satisfy a [plaintiff's] prima facie burden for a retaliation claim," the Fifth Circuit reversed the district court's grant of summary judgment against the plaintiff. Id. at 361-62 (citing temporal proximity cases). The Fifth Circuit's unpublished decision in Handzlik , a case of retaliation in the form of "non-hiring," involved evidence of a two-month span between the plaintiff's protected complaint and adverse action, in combination with other circumstantial evidence of knowledge: a conversation between the plaintiff and the decisionmaker, whose alleged statement that he had heard "talk around the office" about the plaintiff could have meant talk about her protected complaint. Handzlik , 93 Fed.Appx. at 18-19. The decisionmaker admitted that the conversation "could have occurred," yet claimed that the only talk he had heard concerned the plaintiff's dismissal from her previous position, not her protected complaint. Id. at 19. Emphasizing that "the record evidence of causal connection and retaliation depends on credibility," the Fifth Circuit found "enough uncertainty" in the record to warrant denial of the defendant's request for summary judgment. Id. at 21.
In Smith , no direct evidence existed that the decisionmakers knew about the plaintiff's protected activity, but the district court found the issue of knowledge better suited for a jury in view of circumstantial evidence that another employee with knowledge "may have informed" one of the decisionmakers, who then sought out the other decisionmaker to express negative views of the plaintiff's work performance even though she did not directly supervise him and did not complain of anyone in her own department. Smith , 2017 WL 2619342, at *4-5.[29] Finally, Plaintiff cites to Morris , in which the decisionmaker denied knowing that protected activity had occurred at a work meeting attended by the plaintiff, but the district court found the denial "contradicted circumstantially" by evidence that the meeting had been called to address protected employee complaints, the decisionmaker stood at the bottom of the stairs as attendees exited the meeting, and the assistant of the company employee who traveled to preside at the meeting took notes of the discussion and recorded the names of those who spoke, "thus allowing the reasonable inference that the assistant informed [the decisionmaker] of the goings-on at the meeting." Morris , 2005 WL 2291188, at *7. This evidence, considered in light of a six-week interval between the meeting and the plaintiff's termination, sufficed to make out a prima facie case of *668 retaliation at the summary judgment stage. Id.
iii. Circumstantial Evidence Creates Fact Issue in This Case
Defendant's Motion emphasizes that he and all of the other sitting Justices, including Justice Perkes, aver that they did not learn of Plaintiff's filing of a formal complaint against Defendant until after Plaintiff's job offer was withdrawn. (Dkt. No. 91 at pp. 34-35). Chief Clerk Ramirez, Chief Staff Attorney Gsanger, and Defendant's legal assistant Coronado, all of whom worked under Defendant's direct supervision, also disavowed knowledge. Plaintiff, on the other hand, emphasizes that Justice Perkes asked him about his complaint with the SCJC during the interview process, and also told Plaintiff that Defendant "took it upon himself to tell all the judges on the court not to allow [Plaintiff] to work for Justice Perkes" because of that complaint. (Dkt. No. 94 at pp. 30-31). Whereas Perkes testified that he learned about Plaintiff's formal complaint from junior attorney Lockwood after the adverse action had occurred, Plaintiff claims that Lockwood "disputed Justice Perkes's testimony, and testified that Justice Perkes in fact told him about the complaint." Id. at p. 30. However, Lockwood recalled Perkes telling him that Plaintiff "might be privy to certain information involving [Defendant] that [Defendant] knows about, and...he's taking...retaliation against [Plaintiff]," and could "not recollect whether [Perkes] said that the process had been formalized through a complaint or not." Perkes's testimony provides further insight into the "information" to which he may have been referring in his alleged comments to Lockwood; although, in an exchange of text messages with Justice Vela, Perkes surmised that Defendant may have retaliated against Plaintiff because he "got wind" of the "investigation," Perkes explained in his deposition that the investigation to which he referred was the "original" one by Justices Vela and Perkes into the Chapter 22 fund, leading them to request an audit of that fund. As Defendant emphasizes, Perkes also explained that his statements regarding Defendant's motive were informed by "gut feelings," not by actual knowledge that Defendant had intervened in Perkes's hiring decision because of Plaintiff's protected speech. (Dkt. No. 96 at pp. 20-22). In combination, Plaintiff's and Lockwood's testimony at least calls into question whether Justice Perkes knew of Plaintiff's SCJC complaint at the relevant time, but the Court agrees with Defendant that, standing alone, this testimony does not place Defendant's knowledge in genuine dispute.
Nonetheless, the record also contains evidence that at the time of the adverse action, former Justice Vela, former Chief Clerk Wilborn, Justice Perkes's legal assistant Holloway, and Civil Clerk Fowler knew of Plaintiff's communications with the SCJC and/or Travis County DA's Office. Lockwood also testified to his belief that Justice Rodriguez's staff attorney knew that Plaintiff had filed a formal complaint against Defendant, and may have first relayed that information to Lockwood-a belief finding implicit support in the testimony of Perkes, who explained that the Corpus Christi staff had offices together on one side of the building, and that "they're going to talk to each other."[30] The record also provides support for the Fifth Circuit's pleading-stage observation *669 that Plaintiff's "confidential" letters were not, in fact, wholly confidential; the record confirms that "Chief Justice Jefferson did not answer the [first] letter himself," Anderson , 845 F.3d at 591, and Justice Vela testified that SCJC investigator LeMoine contacted her for information relating to the investigation stemming from Plaintiff's complaint. See Anderson , 845 F.3d at 591-92.[31] Notably, the SCJC's November 13, 2012 letter in response to that complaint, as well as Vela's testimony, indicate that the SCJC may have construed the complaint as an invitation to investigate Vela as well as Defendant, yet LeMoine still contacted her directly. In sum, Plaintiff has presented evidence that multiple individuals associated with the Thirteenth Court, or with the persons or entities to whom Plaintiff reported his suspicions of "double dipping," knew that Plaintiff had filed a formal complaint against Defendant and in some cases, had communicated that knowledge to others, at the time of the adverse action.
Under Bregon , generalized evidence of employee awareness raised a fact issue in combination with evidence that the plaintiff's protected complaint and termination occurred close-in-time to one another, and the decisions in Handzlik and Morris also rely on evidence of temporal proximity. This case, however, differs from these and other decisions in which temporal proximity, and the inference to be drawn from it, are determined by comparing two definitive points in time. Were the Court to do so here, it would note that Defendant's intervention in Justice Perkes's hiring decision post-dated Plaintiff's letters to Chief Justice Jefferson and the SCJC by almost a year and a half, whereas Plaintiff's communications with the Travis County DA's Office approximate the adverse action more closely, with Plaintiff's second contact occurring less than a month before Defendant's intervention in his hiring. However, Defendant conceivably could have acquired the knowledge necessary for a retaliatory animus at any point between October 2012 and the adverse action, and since Plaintiff left employment with the Thirteenth Court in December 2012 and was prevented from returning in May 2014, Defendant had little occasion to act on any knowledge he may have obtained until that time.[32] Temporal proximity is conceivable, but too speculative to supply the requisite inference of knowledge and causation.[33]
Rather, that inference hinges on the remaining evidence to which Plaintiff points-evidence which, as in Handzlik and the district court cases on which Plaintiff relies, raises sufficient "uncertainty" regarding Defendant's knowledge and animus for the adverse action. That is, the record contains evidence that Plaintiff worked for the Thirteenth Court for over 20 years, during which time he was promoted and rehired by multiple Justices.
*670 Defendant and four of the Justices, as well as two of the employees under Defendant's direct supervision, attested to concerns about Plaintiff and his work product as the catalyst for their disapproval of his hiring in May 2014, with Defendant specifically recalling that he raised the following concerns with Justice Perkes: (1) Plaintiff's "lack of cooperation being a team player..., following up on the duties of edits"; and (2) that Plaintiff "only did criminal cases," and Perkes had repeatedly asked for help with the civil docket. Justice Perkes did not see these concerns as impediments to Plaintiff's hiring, and in fact, he and Justice Vela for whom Plaintiff had worked, as well as Perkes's junior attorney Lockwood who also worked with Plaintiff, described Plaintiff and his work product in a vastly different light. Plaintiff's response suggests that "if [Plaintiff's] work product or personality were as deficient as [Defendant] now claims, there would be some record of it before May 2014," yet the record contains no evidence of any disciplinary complaints or opposition to Plaintiff's employment until that time. (Dkt. No. 94 at p. 32). The record does contain evidence that, when Justice Vela retired in December 2012, Defendant and the other Justices (save Perkes) opposed Plaintiff's request to stay on in a volunteer capacity, but only because volunteer attorneys were unprecedented, and not because of any deficiencies in Plaintiff's personality or work. Nonetheless, approximately a year and a half after Plaintiff left the Court, during which time no one had occasion to review Plaintiff's work product, these deficiencies apparently served as cause to oppose Plaintiff's hiring by Justice Perkes. Of course, during that year and a half, the SCJC investigation engendered by Plaintiff's initial letter and complaint was ongoing, and Plaintiff wrote letters to the DA's Office in an attempt to aid in that entity's own investigation of Defendant. In this respect, the summary judgment evidence in this case aligns with that in Smith , where evidence existed that the decisionmaker at least had occasion to acquire knowledge of the plaintiff's protected complaint through another employee, after which she expressed negative opinions about the plaintiff even though she did not supervise him directly.
As Plaintiff points out, the record also contains evidence that Defendant's interference in Plaintiff's hiring violated the Court's own Procedures and Administrative Rules, which allowed Justices to hire their own staff attorneys, and also that the extent of Defendant's interference was "unprecedented." (Dkt. No. 94 at pp. 32-34). Although Justice Perkes and Gsanger posited that the Justices' majority vote to disapprove of Plaintiff's hiring itself constituted an authorized suspension of the Administrative Rule allowing Justices to hire their own staff, thereby effectively disallowing the hiring, Defendant himself disagreed. Rather, he characterized his intervention in the hiring decision and his consultation with the other Justices as stemming from the need to assure himself that Plaintiff was "qualified." Defendant explained that on another occasion, he told Justice Longoria not to hire a senior staff attorney who did not meet the minimum qualifications-in particular, the three-to-five years' legal experience also required in Justice Perkes's job posting. Yet, even though Defendant was aware of the needs of Perkes's docket, his interference in Plaintiff's hiring left Perkes without a senior attorney for approximately two months, and Plaintiff's eventual replacement was Lockwood, who admittedly lacked the minimum legal experience for the job. In other words, as Plaintiff puts it, the evidence at least calls into question whether Defendant "typically enforces the Thirteenth Court's administrative rules and hiring procedures by requiring judges to hire attorneys who meet the minimum requirements, but violated these rules and *671 procedures to ensure that [Plaintiff] would not work for the Thirteenth Court." Id. at pp. 33-34.
Defendant identified only one other instance when he intervened in another Justice's decision to hire staff, explaining that he initiated a reference check for another applicant for the position of senior attorney for Justice Longoria, and then relayed to Longoria that the check had resulted in "some negative reviews" of the applicant. As Plaintiff emphasizes, in contrast to this case, no evidence exists "that Justice Longoria still wished to hire the applicant after learning of the negative references, that [Defendant] gathered the opinions of other justices in an attempt to overrule Justice Longoria's decision, or that [Defendant] forbade Justice Longoria from hiring the applicant." Id. at p. 34.
Although the evidence on which Plaintiff relies differs in some respects from the evidence precluding summary judgment in the cited cases-in particular, no inferences may be drawn from any direct conversation between the parties themselves, and as Defendant points out, this case does not involve the same "open airing of the allegedly protected speech" in Morris -these factual distinctions are not dispositive ones. In combination with evidence that multiple individuals knew and in some cases, communicated with others, about Plaintiff's protected speech, the circumstantial evidence to which Plaintiff cites at least raises a fact issue on whether Defendant learned of that speech, and then acted on it by interfering with Justice Perkes's decision to hire Plaintiff. See (Dkt. No. 96 at pp. 18-19).
c. Defendant's Burden: Whether the Adverse Action Would Have Occurred Regardless of Plaintiff's Protected Speech
In arguing that he meets his burden at the second step, Defendant focuses on Justice Perkes as the "hiring authority," and claims that Perkes would have withdrawn Plaintiff's offer of employment regardless of Defendant's expressed concerns about Plaintiff (whether they carried a retaliatory motivation or not), once he learned that all of the other Justices disapproved of Plaintiff's hiring. (Dkt. No. 91 at pp. 35-36). However, Perkes in fact testified that he considered the majority vote an effective suspension of the Administrative Rule allowing for Justices to hire their own staff, and that although he was "steadfast in favor" of Plaintiff, his decision to hire Plaintiff was "countermanded" and his only recourse was to write to the Chief Justice of the Texas Supreme Court or the OCA, "neither of which really had jurisdiction over the local court." In other words, as Plaintiff observes, evidence exists that Perkes did not voluntarily withdraw Plaintiff's job offer, casting doubt on Defendant's claim that Perkes would have made the same decision absent Defendant's intervention. (Dkt. No. 94 at pp. 35-36).
In any event, as Plaintiff points out, the focus is the decisionmaker whose alleged adverse action constituted the retaliation, and in this case, that decisionmaker is Defendant. Id. at p. 36. Defendant has proffered legitimate reasons for inserting himself into Justice Perkes's decision to hire Plaintiff: concerns that Plaintiff was not a suitable candidate for the position of Perkes's senior staff attorney because he was not a "team player" in the editing process, and that he "only did criminal cases" and Perkes needed help with his civil docket. Further, evidence exists that other Justices and employees expressed these and other concerns about Plaintiff and his work product to Defendant, and that Defendant acted in response to these concerns.
*672 d. Plaintiff's Burden: Pretext
Still, for the same reasons discussed supra , Plaintiff has offered evidence to place in genuine dispute whether Defendant's proffered reasons were the real ones, or simply pretext for retaliation on account of Plaintiff's protected speech. See Handzlik , 93 Fed.Appx. at 20-21 (quoting Reeves , 530 U.S. at 143, 120 S.Ct. 2097 ) ("[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom...on the issue of whether the defendant's explanation is pretextual[.]") (internal quotations omitted). In Evans v. City of Houston , 246 F.3d 344 (5th Cir. 2001), to which Plaintiff cites, the Fifth Circuit found that the summary judgment record raised a fact issue on pretext, in part because it contained no contemporaneous evidence of any disciplinary action taken against the plaintiff before her demotion, and "after-the-fact documentation cannot be evidence to justify a demotion because of disciplinary problems." (Dkt. No. 94 at p. 32); Evans , 246 F.3d at 355-56. The summary judgment record in this case also lacks evidence of any disciplinary action or opposition to Plaintiff's employment with the Court, which spanned more than 20 years, prior to the adverse action. Although Defendant, four other Justices, and two Court employees have now provided evidence that they concurred in the ultimate decision not to hire Plaintiff because of legitimate concerns about his personality and work product, these concerns surfaced as an impediment to Plaintiff's employment only at the time of the adverse action, and the Court cannot ignore the contrary assessments of Plaintiff by Justice Vela for whom he actually worked, by Justice Perkes who wanted to hire him, and by Perkes's junior attorney who had worked with Plaintiff and was amenable to doing so again. Defendant contends that Plaintiff has failed to refute "each independent ground asserted for not wanting him back at the court" to raise a fact issue as to pretext, but in fact Justice Vela cast doubt on those reasons, and in particular the reasons given by the relevant decisionmaker-that Plaintiff was not a team player in the editing process, and that he did only criminal cases. (Dkt. No. 96 at p. 25). Further, Justice Perkes testified that the concerns raised to him by Justice Benavides and Defendant did not dissuade him from hiring Plaintiff. Only after Perkes discounted those reasons did Defendant "take it en banc," and even though the record contains evidence that the other Justices voted to disapprove of Plaintiff's hiring on the basis of their own opinions about him and his work, evidence also exists that Defendant instigated the vote, told the other Justices that he "personally" had problems with Plaintiff's hiring, and ultimately asked Ramirez and Gsanger to call him about his decision on Plaintiff.[34]
Citing to Title VII precedent, Defendant also submits that Plaintiff cannot create an inference of pretext through evidence of "past practices" of the Court, because he "cannot show that any similarly situated applicant or situation...received more favorable treatment." Id. at p. 25 (citing Okoye v. Univ. of Tex. Houston Health Sci. Ctr. , 245 F.3d 507 (5th Cir. 2001) ). The similarly situated analysis applies in the context of Title VII disparate treatment claims, and involves consideration of whether the employer treated the *673 plaintiff less favorably than similarly situated employees outside the protected class to which the plaintiff belongs. See Okoye , 245 F.3d at 513 ; Alkhawaldeh v. Dow Chem. Co. , 851 F.3d 422, 426 (5th Cir. 2017). Assuming that the analysis is required here, the Court can comfortably presume that during Defendant's years on the Thirteenth Court, the vast majority if not all of the staff attorneys hires of Defendant's fellow Justices had not filed formal complaints of misconduct against him at the time of their hiring, and in fact Defendant admitted that he did not intervene in any other Justice's hiring decision to the extent that he did in the present case. This is some indication that Defendant treated similarly situated individuals who did not exercise their First Amendment rights, as Plaintiff is alleged to have done, more favorably.[35] Moreover, that Defendant told another Justice not to hire a senior attorney lacking the requisite minimum legal experience, yet allowed Plaintiff to be replaced by an attorney also lacking such experience, constitutes additional evidence of a pretextual motive. In the end, the Court must be mindful that "[s]ummary judgment should be used most sparingly in...First Amendment cases...involving delicate constitutional rights, complex fact situations, disputed testimony, and questionable credibilities." Haverda , 723 F.3d at 592 (quoting Beattie v. Madison Cty. Sch. Dist. , 254 F.3d 595, 600 (5th Cir. 2001) ). Defendant's knowledge of Plaintiff's protected speech, and whether he acted on that knowledge when he intervened in Justice Perkes's hiring of Plaintiff, are fact-intensive inquiries best left to a jury. See id. (citing 10B Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 2732.2 (3d ed. 2013) ("[C]laims requiring a determination regarding intentions or motives are particularly unsuitable for summary adjudication....").
C. Qualified Immunity
In addition to challenging the elements of Plaintiff's First Amendment claim, Defendant in his individual capacity renews his appeal to the defense of qualified immunity from that claim, on the basis of the summary judgment record now before the Court. (Dkt. No. 91 at pp. 36-42). "[T]he doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." Anderson , 845 F.3d at 599 (quoting Whitley , 726 F.3d at 638 ). The "basic steps" of the Fifth Circuit's qualified-immunity inquiry are well-established; relevant to this case, a plaintiff seeking to defeat qualified immunity must show (1) that the official violated a constitutional right and (2) that the right was "clearly established" at the time of the challenged conduct. Id. at 600 (quoting Morgan v. Swanson , 659 F.3d 359, 371 (5th Cir. 2011) ). In rejecting Defendant's challenges to the second and fourth elements of Plaintiff's First Amendment claim, the Court has already addressed the first prong of the qualified-immunity inquiry at this stage. Therefore, the Court proceeds to the second prong: whether the "contours" of the asserted right were "sufficiently clear" or "definite," such that "any reasonable official in the defendant's shoes would have understood that he was violating" that right. Id. (quoting Anderson , 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ); Plumhoff v. Rickard , --- U.S. ----, 134 S.Ct. 2012, 2023, 188 L.Ed.2d 1056 (2014).
*674 As of May 2014, it had long been established that adverse employment actions taken in retaliation for speech on matters of public concern violate the First Amendment (subject, of course, to the 2006 decision in Garcetti ), and that "[t]here is perhaps no subset of 'matters of public concern' more important than bringing official misconduct to light." Davis v. Ector Cty. , 40 F.3d 777, 782 (5th Cir.1994) ; see , e.g. , Keenan v. Tejeda , 290 F.3d at 258. Defendant does not contest that an adverse employment action has occurred-Plaintiff's "un-hiring"-and again, the record places in genuine dispute whether Defendant effectuated the adverse action, and whether he did so with knowledge of and because of Plaintiff's letter to Chief Justice Jefferson, complaint to the SCJC, and/or letters to the Travis County DA's Office. Therefore, the narrow question posed to the Court by the second prong is whether, in light of concessions or evidence that other clearly-established elements of Plaintiff's retaliation claim are met, the record also establishes that any reasonable official in Defendant's shoes would have known that Plaintiff's speech constituted citizen rather than employee speech under Garcetti .[36]
In addressing this narrow question at the pleading stage, the Fifth Circuit focused on its decision in Cutler v. Stephen F. Austin State Univ. , 767 F.3d 462 (5th Cir. 2014), observing that by at least 2014, Cutler had "clearly established that an employee's speech made 'externally' concerning 'an event that was not within [his] job requirements was entitled to First Amendment protection." Anderson , 845 F.3d at 599 (quoting Cutler , 767 F.3d at 472-73 ). Notably, the dissenting opinion did not dispute the majority's determination that Plaintiff's speech concerned "an event that was not within his job requirements"; in fact, the dissent observed that it was consistent with pre-2014 precedent to conclude that Plaintiff "was not employed to investigate and report judicial malfeasance beyond his [intra-office] response to Justice Vela's inquiry," and that "his complaints 'up the chain' reflect protected speech as a citizen on matters of public concern." Id. at 605. The dissent also found that Plaintiff "necessarily went outside his 'chain of command' when he reported about [Defendant] on his own to the [SCJC]," and acknowledged that "[t]his logic suggests an argument for denying qualified immunity." Id. at 606. The dissent ultimately decided not to accept this argument on the following grounds:
Nevertheless, the issue is more complex than the majority's analysis argues because, under the Texas Constitution, the [SCJC] includes members of the public, but its proposed sanctions against a judge are ultimately reviewable by the Texas Supreme Court. The Texas judiciary may thus be considered its own self-regulator. In this situation, [Defendant's] argument is far from frivolous that Plaintiff's complaint went up the 'chain of command' within the judiciary.
Id. (citing TEX. CONST. art. VI, §§ 1-a(2), (9)). The dissent concluded that on the *675 basis of the pleaded allegations, Defendant "visited unconstitutional retaliation upon [Plaintiff] but the law was not 'clearly established' such that any 'reasonable [judicial] official would understand' that [Plaintiff's] speech was constitutionally protected because it occurred outside the [briefing attorney's] 'chain of command.' " Id. at 607 (quoting Anderson , 483 U.S. at 640, 107 S.Ct. 3034 ) (some alterations in original).
At this stage, the pleaded facts relevant to a determination that Plaintiff's speech concerned "an event that was not within his job requirements" find support in the record; Plaintiff and Justice Vela testified that Vela did not require the speech at issue, and the Court does not read Garcetti to allow for the reasonable inference that an ethical duty applicable to all attorneys becomes a job requirement because a state's judicial code and a plaintiff's oath of employment reiterate its application. That Plaintiff offered a professional opinion on whether Defendant had committed a crime to his immediate supervisor, Justice Vela, and that he formed his opinion on the basis of information given him by Vela at work, do not (as Defendant submits) alter the analysis; it is the forwarding of that opinion to others on his own accord that constitutes the speech at issue, and as of the date of the adverse action, Garcetti and Fifth Circuit precedent had dismissed the idea that speech concerning the "subject matter" of a plaintiff's employment or "facts that he happened to learn while at work" necessarily falls outside First Amendment protection. Garcetti , 547 U.S. at 421, 126 S.Ct. 1951 ; Charles v. Grief , 522 F.3d 508, 513 (5th Cir. 2008) ; see (Dkt. No. 91 at pp. 37-38; Dkt. No. 94 at p. 38). Nor does it matter that Plaintiff's speech may have "furthered [Justice Vela's] purpose and, indeed responsibilities, as a Justice." (Dkt. No. 91 at p. 38). As Plaintiff rightly observes, Garcetti asks courts to conduct a "practical" examination of "the duties an employee actually is expected to perform," and in no way suggests that a supervisor 's job duties inure to the employee. Garcetti , 547 U.S. at 424-25, 126 S.Ct. 1951 ; see (Dkt. No. 94 at p. 38).
Defendant's Motion also seizes and expands on the basis for the dissent's determination that qualified immunity was warranted at the pleading stage, arguing that at the time of the acts giving rise to this case, precedent had not clearly established that Plaintiff's letters and complaint constituted "external" speech. (Dkt. No. 91 at p. 38). However, the majority has already concluded that precedent made reasonably clear, as of 2014, that Plaintiff's complaint to the SCJC was made outside his chain of command, and even conceding to the dissent that the Texas Supreme Court has the ability to review SCJC sanctions, this Court cannot ignore Plaintiff's uncontested argument that the SCJC remains an independent state agency with disciplinary power over Texas judges, not their staff. (Dkt. No. 94 at p. 40); see TEX. GOV'T CODE § 33.002 (SCJC is "an agency of the judicial branch of state government [that] administers judicial discipline" but "does not have the power or authority of a [state] court"); TEX. CONST. art. V, § 1 (a)(6) (addressing sanctions which may be imposed or recommended by SCJC against "[a]ny Justice or Judge of the courts established by this Constitution or created by the Legislature"). The focus is not the chain of command of the subject of Plaintiff's complaint, but of the speaker himself. Therefore, no reasonable judge could have believed that Plaintiff spoke within his own chain of command when he complained of possible judicial misconduct to the SCJC or, for that matter, to the Travis County DA's Office by virtue of any jurisdiction it may have had to investigate crimes involving state judicial officials.
Moreover, even accepting the dissent's characterization of the judiciary as "its *676 own self-regulator," the Court does not read Garcetti to allow public entities to self-regulate in a constitutional vacuum. As Plaintiff points out, whether speech is made "outside the chain of command" is a basis-but not the only basis-for determining whether that speech falls within the confines of Garcetti . As Cutler observed, Garcetti involved "intra-office speech," yet the fact that the prosecutor may have spoken within his chain of command did not determine the Supreme Court's holding; rather, Garcetti "concluded that the deputy's speech was not entitled to First Amendment protection because it was made pursuant to his official duties, specifically in fulfillment of his responsibility to advise his supervisor about how best to proceed with a pending case." Cutler , 767 F.3d at 472 (citing Garcetti , 547 U.S. at 414, 421-23, 126 S.Ct. 1951 ). The overarching inquiry is just that-whether the employee spoke pursuant to his official duties-regardless of whether he spoke "internally" or "externally." See Davis , 518 F.3d at 315-16 (speech made internally to supervisors that "related to [the plaintiff's] work within the internal audit department and to her core job description, 'to oversee computer-related audits and create audit summaries and reports,' " constituted employee speech, whereas similarly internal speech regarding number and pay of vice-presidents "did not relate to computer use or the internal audit department specifically," and constituted citizen speech); (Dkt. No. 94 at pp. 40-41).
Consistent with this precedent, the Fifth Circuit's decision at the pleading stage did not consider whether Plaintiff spoke outside his chain of command in concluding that Plaintiff had sufficiently pleaded the second element of his First Amendment retaliation claim, nor is any such consideration vital to a determination of whether Defendant is entitled to qualified immunity. Rather, where an employee does not speak in the course of performing his job,[37] and his duty to speak has an "analogue to speech by citizens who are not [public] employees," Garcetti and pre-2014 precedent make sufficiently clear that an employer lacks the "automatic" ability to discipline him for reporting governmental misconduct. As of 2014, it was not reasonable for any state judicial official to believe that by requiring a briefing attorney to take an oath reiterating an ethical obligation that he already had, a state court of appeals through a sitting justice could effectively squelch the very speech that obligation compelled, by retaliating against the attorney for reporting the justice's alleged misuse of public funds. In this Court's view, guiding precedent rendered resolution of the narrow question posed by the second prong of the qualified-immunity inquiry "beyond debate" in the present case, and gave anyone in Defendant's shoes the requisite "fair" and "reasonable" warning that Plaintiff's letters and complaint constituted citizen speech. Anderson , 845 F.3d at 600 (quoting Whitley , 726 F.3d at 638 ; Kinney v. Weaver , 367 F.3d 337, 350 (5th Cir. 2004) ) (emphasis omitted). The Court must therefore deny Defendant's appeal to qualified immunity. See ids="9246988" index="130" url="https://cite.case.law/f3d/367/337/#p350">id.
D. Relief Requested against Defendant in His Official Capacity
On the basis of uncontested facts established by the summary judgment record, Defendant in his official capacity also seeks summary judgment on Plaintiff's request *677 for injunctive relief in the form of reinstatement, on the grounds that the Eleventh Amendment to the U.S. Constitution bars any such relief. (Dkt. No. 94 at p. 24). Although this Court's prior order denying Defendant's motion to dismiss considered and rejected Defendant's appeal to Eleventh Amendment immunity, it did so under a different set of facts. See (Dkt. No. 42 at pp. 17-18). As the Court previously observed, it is well-established that a § 1983 plaintiff meets the Ex Parte Young exception to a State's Eleventh Amendment immunity from suit by seeking relief "against individual persons in their official capacities as agents of the state," that is "injunctive in nature and prospective in effect." Aguilar v. Dep't of Crim. Justice , 160 F.3d 1052, 1054 (5th Cir. 1998). Further, the Fifth Circuit has held that "a request for reinstatement [under § 1983 ] is sufficient to bring a case within the Ex parte Young exception to Eleventh Amendment immunity, as it is a claim for prospective relief designed to end a continuing violation of federal law." Nelson v. Univ. of Tex. at Dallas , 535 F.3d 318, 324 (5th Cir. 2008) ; see also Warnock v. Pecos Cty. , 88 F.3d 341 (5th Cir. 1996) (in First Amendment retaliation case, plaintiff's request for reinstatement from two state judges permissible as a claim for prospective relief). At the time that Defendant first asserted the absence of any "continuing" First Amendment violation (and the Court rejected that argument), Perkes still served as a Justice for the Thirteenth Court, and Plaintiff's reinstatement to the position of staff attorney would have constituted injunctive relief designed to end the particular violation of federal law asserted here-Defendant's retaliatory interference in Perkes's hiring of Plaintiff. See (Dkt. No. 42 at pp. 17-18); (Dkt. No. 91, PERKES DEP. at p. 10). It is undisputed that Perkes has since lost his bid for reelection, and that his term ended on December 31, 2016, in which case Defendant now takes the position that any ongoing violation authorizing reinstatement has also ended. (Dkt. No. 91 at pp. 23-24; PERKES DEP. at pp. 10-11).
Plaintiff counters that in Warnock , supra , described as "the law of the this circuit" on the issue of reinstatement as prospective relief, see Nelson , 535 F.3d at 324, the Fifth Circuit held that the plaintiff's request for reinstatement to the appointed position of county auditor must be permitted to continue even though the two-year term for county auditor had already expired, and "a new auditor had undoubtedly long been in place[.]" (Dkt. No. 94 at p. 17) (citing Warnock , 88 F.3d at 342 (noting two-year term); Warnock v. Pecos Cty. , 116 F.3d 776, 777 (5th Cir. 1997) (noting that plaintiff first challenged the choice not to reappoint her in 1993, such that two-year term would have expired)). Moreover, to accept Defendant's position would be to adopt a view of the Eleventh Amendment as a shifting jurisdictional bar, triggered not by the nature of the relief requested but by practical considerations affected (as in this case) by litigation tactics and the passage of time. Shifting practical considerations do, of course, come into play in determining whether reinstatement is "appropriate" or "feasible," and the Court agrees with Defendant that Justice Perkes's exit from the bench is a factor counseling against this remedy. See (Dkt. No. 91 at p. 24) (citing Prof'l Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cty. Cmty. Coll. Dist. , 730 F.2d 258, 268 (5th Cir. 1984) ("Reinstatement may not be an appropriate remedy because, as a practical matter, by the time the court must decide on an appropriate remedy, the contract term, which would not have been renewed for independent and lawful reasons, may have expired.")); Deloach v. Delchamps, Inc. , 897 F.2d 815, 822-24 (5th Cir. 1990) (reinstatement is *678 equitable remedy under § 1983, and "is generally the preferred remedy for a discriminatory discharge" unless district court determines that reinstatement is not "feasible").[38] The gravamen of Plaintiff's complaint is that Defendant unlawfully interfered in a hiring decision that was Justice Perkes's alone to make; now that Perkes has left the bench, to place Plaintiff in the position of another Justice's staff attorney would create the irony of a remedy that mirrors the adverse action. See (Dkt. No. 96 at p. 16). Nonetheless, feasibility remains a fact-intensive determination, to be made only if Plaintiff prevails on the merits of his claim; that a particular factor counsels against a finding of feasibility at this time does not warrant summary judgment. See (Dkt. No. 94 at p. 18); Prof'l Ass'n of Coll. Educators , 730 F.2d at 269 (after plaintiff had prevailed at trial, remanding to district court to "consider the facts relating to [the plaintiff's] right to reinstatement...to determine whether it is an appropriate remedy in this case"); Deloach , 897 F.2d at 822 (setting forth factors permissibly considered by district court in denying reinstatement after trial); Ray v. Iuka Special Mun. Separate Sch. Dist. , 51 F.3d 1246, 1253-54 (5th Cir. 1995) (same).
V. Conclusion
For the foregoing reasons, the Court hereby ORDERS that Defendant's Motion for Summary Judgment is DENIED .
SO ORDERED this 14th day of November, 2017, at McAllen, Texas.

Plaintiff's Original Complaint also sued the State of Texas. (Dkt. No. 1). The State moved to dismiss the claims against it on grounds of Eleventh Amendment immunity to suit, after which Plaintiff filed a First Amended Complaint omitting the State as a Defendant. (Dkt. Nos. 11, 12).

The parties have submitted multiple, overlapping summary judgment exhibits. In the case of overlap, the Court will cite only to the exhibit submitted by Defendant. Consequently, the Court's citation to the summary judgment record submitted by Plaintiff indicates an exhibit not also submitted by Defendant.

See also Tex. Gov't Code § 22.214.

As used throughout this Order, "chambers" refers to a Justice's staff or office. See (Dkt. No. 91, Gsanger Dep. at p. 26).

Deposition transcripts contain various spellings of Wilborn's name. See (Dkt. No. 91, Vela Dep. at p. 20 (Kathy Wilborn); Plaintiff Dep. at p. 34 (Cathy Wilburn); Defendant Dep. at p. 86 (Cathy Wilborn)). For ease of reference, the Court will use the spelling found in Plaintiff's letters to the Travis County DA's Office, discussed infra . See (Dkt. No. 91 at pp. 547-52).

See also Tex. Gov't Code § 22.2141 (establishing Thirteenth Court "appellate judicial system" to assist in processing of appeals and to defray costs and expenses incurred by counties under § 22.214, to be funded by fees "of not more than $5 for each civil suit filed"); Tex. Gov't Code § 22.214 (requiring counties to furnish and equip office space and pay supplemental salaries, car allowances, and fringe benefits for Thirteenth Court Justices). The Chapter 22 fund is also referred to in the record as the "local fund" or "filing fee fund." (Dkt. No. 91, Plaintiff Dep. at p. 26; Gsanger Dep. at p. 232; Perkes Dep. at pp. 35-36; Ramirez Dep. at pp. 9-10; Holloway Dep. at pp. 28-29; Dkt. No. 91 at p. 556).

See also Tex. Gov't Code § 22.2141(e), (f) (requiring that balance remaining in fund at close of fiscal year be forwarded "to the court of appeals for expenditure by the court of appeals for the court's judicial system," and "vest[ing] management of the system in the chief justice of the court of appeals").

Justice Perkes identified Yowell as the former Chair of the Nueces County Republican Party. (Dkt. No. 91, Perkes Dep. at p. 119). The record contains testimony that at some point, Yowell passed away and the new Chair, Mike Bergsma, took over the open records request. (Dkt. No. 91, Plaintiff Dep. at pp. 23-24, 117-18; Perkes Dep. at pp. 37, 152-53, 285).

The July 5, 2011 letter, as submitted to the Court, does not disclose to whom Vela and Perkes directed this correspondence.

Section 321.017 governs "Review and Oversight of Funds and Accounts Receiving Court Costs," and provides that "[t]he state auditor may review each fund and account into which money collected as a court cost is directed by law to be deposited [.]" Tex. Gov't Code § 321.017.

These statements and documentation are not part of the summary judgment record.

Plaintiff did not testify about the potential destruction of documents. However, Justices Vela and Perkes both testified to their concern regarding a November 10, 2011 email from Defendant to all of the Justices, in which Defendant revealed that some of the documents sought through the open records request pre-dated the Court's record retention period and had been destroyed. (Dkt. No. 91, Vela Dep. at pp. 55-59; Perkes Dep. at pp. 151-55).

The position of Chief Clerk is also referred to as the "Clerk of the Court." See (Dkt. No. 91, Ramirez Dep. at p. 5).

Justice Vela did not recall speaking to Plaintiff about the Travis County DA's Office investigation, and the record contains no indication of how Plaintiff may have gained this awareness. (Dkt. No. 91, Vela Dep. at pp. 106-07).

Plaintiff testified that sometime after he left employment with the Thirteenth Court, in 2013 or 2014, he spoke with Wilborn about his conversation with Vela concerning Defendant's possible receipt of double reimbursements. (Dkt. No. 91, Plaintiff Dep. at pp. 34-35, 38).

Defendant testified that Ramirez and Gsanger, both of whom were based in Corpus Christi, were employees under his immediate supervision. (Dkt. No. 91, Defendant Dep. at p. 21; see Ramirez Dep. at p. 39; Gsanger Dep. at p. 18).

Gsanger recalled three other instances when the Court en banc intervened in a hiring or firing decision: (1) when former Justice Castillo wanted to fire a briefing attorney and the Court en banc determined that he should not be fired; (2) when the Justices convened en banc to determine whether to terminate another of Justice Castillo's attorneys who she wanted to retain, but the Justices never voted because the attorney resigned in lieu of termination; and (3) when Defendant wanted to retain a deputy clerk who had made inappropriate remarks about a sitting Justice, but the Court en banc determined that she should be fired, and she was. (Dkt. No. 91, Gsanger Dep. at pp. 50-52).

Perkes testified that "up here" referred to Corpus Christi, where Ramirez was based. (Dkt. No. 91, Perkes Dep. at pp. 287-88).

Perkes wrote "did make edits," but testified in his deposition that this was a "typo" and that he meant to say, "did not make edits." (Dkt. No. 91 at p. 573; Perkes Dep. at pp. 80-81).

Gsanger provided more detailed testimony about the layout of the Corpus Christi office, explaining that it encompasses the entire tenth floor of the Nueces County Courthouse, with a public entrance at one end, a foyer on the other end, and offices on either side. (Dkt. No. 91, Gsanger Dep. at p. 94). Gsanger further explained that the Justices had offices on one side and the attorneys and legal assistants on the other, and that Gsanger and Ramirez had offices "right off [the] foyer," adjacent to the staff attorneys and legal assistants. Id.

As detailed supra , Plaintiff also testified that he had spoken with former Justices Vela and Perkes about his complaint filed with the SCJC, and Holloway testified that Plaintiff told her about his "grievance."

The record does not indicate how the SCJC may have been apprised of Plaintiff's allegations of retaliation.

By separate order of the Court, the only evidence providing such indication has been stricken from the summary judgment record.

See infra n. 34.

As the Fifth Circuit observed, the Garcetti inquiry "shift[s]...focus from the content of the speech to the role the speaker occupied when he said it." Anderson , 845 F.3d at 592 n.32 (quoting Williams v. Dallas Indep. Sch. Dist. , 480 F.3d 689, 692-93 (5th Cir. 2007) ). That is, even if the plaintiff indisputably spoke on a matter of public concern, his speech falls outside First Amendment protection if he spoke pursuant to his official duties as an employee.

Although, as Defendant notes, the record now contains evidence that Plaintiff informed Justice Vela of his complaint to the SCJC after he had made it, Plaintiff's disclosure to Vela when he was no longer employed by her does not somehow establish that he spoke pursuant to his official duties. (Dkt. No. 91-1 at p. 1).

Defendant's reply also appeals to Nixon in an attempt to support the premise; however, the officer's accident-scene statements, even if unauthorized by his superiors, were made "while on duty, in uniform, and while working at the scene of the accident," were "intended to inform the public of the circumstances of [a] high-speed chase [by other officers], the subsequent accident, and [the employer's] high-speed chase policy," and "[q]uite simply," had no relevant analogue to speech by citizens. (Dkt. No. 96 at pp. 7-8, 10); see Nixon , 511 F.3d at 498-99. Plaintiff did not similarly speak "while on duty," and for the reasons explained supra , the requisite citizen analogue exists in the present case.

Although the cases to which Plaintiff cites address claims of retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Texas Commission on Human Rights Act ("TCHRA"), and the Sarbanes-Oxley Act ("SOX"), they all involve a threshold causation element, and are instructive regarding the summary judgment evidence required to meet Plaintiff's initial burden in this case. See Bregon v. Autonation USA Corp. , 128 Fed.Appx. 358 (5th Cir. 2005) (unpublished) (Title VII and TCHRA); Handzlik v. United States , 93 Fed.Appx. 15 (5th Cir. 2004) (unpublished) (Title VII); Smith v. Chicago Bridge & Iron Co., N.V. , 2017 WL 2619342 (S.D. Tex. June 16, 2017) (SOX); Morris v. Overnite Transp. Co. , 2005 WL 2291188 (S.D. Tex. Sept. 20, 2005) (Title VII).

The plaintiff's protected activity consisted of requesting an audit in November 2014 and complaining about allegedly fabricated "fixes" after the final audit report was released in April 2015. Smith , 2017 WL 2619342, at *1-2. The plaintiff was terminated two days after the release of the final report and one day after his complaints, but the court did not cite to evidence of temporal proximity as a basis for its denial of summary judgment. Id. at *2.

Gsanger also testified that the Corpus Christi attorneys and legal assistants worked adjacent to each other, and that Gsanger and Ramirez, the latter of whom Perkes described as Defendant's "eyes and ears" in Corpus Christi, had offices next to them.

Vela also testified that the Travis County DA's Office communicated with her about its own investigation of Defendant, although the record indicates that the DA's Office opened this investigation as a result of a letter from Vela herself. The record contains no direct evidence that the DA's Office communicated with Justice Vela, or with anyone, about Plaintiff's April 2013 or April 2014 letters.

Defendant did have occasion to oppose Plaintiff's request to stay on in a volunteer capacity after Justice Vela retired in December 2012, and did, although his proffered reasons for doing so differed from those apparently serving as the basis for his opposition to Plaintiff's hiring by Justice Perkes.

Nonetheless, it is also important to note that the absence of temporal proximity does not negate the inference. See Jordan , 516 F.3d at 300-01 ("[T]he First Amendment can protect against distant retaliation; ...the length of time is probative of causation, but it is not alone determinative.") (internal citation omitted).

For these reasons, and given Justice Perkes's testimony that he did not voluntarily withdraw Plaintiff's job offer, the Court finds that genuine issues of material fact exist on whether the adverse action sufficient to satisfy the first element of Plaintiff's retaliation claim-his "un-hiring"-is attributable to Defendant, as opposed to Justice Perkes or the Court "en banc."

Plaintiff does not present evidence that any other senior staff attorney hire had the same performance deficiencies identified by Defendant, but again, other evidence in the record calls into question whether those deficiencies existed.

At this stage, Defendant is not also entitled to qualified immunity on the asserted grounds that "[n]o clearly established law required that [Defendant] recuse himself from the on-going discussions [with the other Justices] or [from] sharing his opinion and the opinions of his colleagues with Perkes." (Dkt. No. 91 at p. 39). If the extent of Defendant's involvement in Plaintiff's "un-hiring" was his mere participation in discussions and the communication of the fruit of those discussions to Perkes, and if the fruit was not marred by a retaliatory motive on the part of Defendant, then no constitutional violation occurred. However, the record at least calls into question the extent of Defendant's involvement, and whether retaliation on account of Plaintiff's speech played a motivating role in that involvement.

The Fifth Circuit's determination that speech pursuant to an employee's official duties is speech "in the course of performing his job" pre-dated the alleged retaliation in this case. See Anderson , 845 F.3d at 595 (citing Williams , 480 F.3d at 693-94 ; Davis , 518 F.3d at 313 ; Nixon , 511 F.3d at 498 ).

Defendant's Motion cites to Prof'l Ass'n of Coll. Educators as a basis for challenging Plaintiff's standing to request reinstatement, but the case does not address standing, and Defendant's reply omits this argument. See (Dkt. No. 91 at p. 24; Dkt. No. 96 at pp. 15-16). The Motion also resurrects the legal arguments that reinstatement "impermissibly intrudes into the independent function of the Texas judiciary," and is "of the nature of a mandamus," and supports these arguments with the same authority cited at the pleading stage. See (Dkt. No. 91 at p. 25; Dkt. No. 35 at pp. 14-15). Since the Court has already considered and rejected these arguments, and Defendant's reply does not address them, the Court need not address them further. See (Dkt. No. 42 at p. 19; Dkt. No. 96 at pp. 15-16).